723 F.2d 994
 MARCIAL UCIN, S.A., et al., Plaintiffs, Appellees,
v.
SS GALICIA, Her Engines, Tackle, etc., et al., Defendants, Appellees,
v.
PEREZ Y COMPANIA, Third-Party Defendants, Appellees.
Iberbroker, S.A., Defendant, Appellant.
MARCIAL UCIN, S.A., et al., Plaintiffs, Appellees,
v.
SS GALICIA, Her Engines, Tackle, etc., et al., Defendants, Appellants,
v.
PEREZ Y COMPANIA, et al., Third-Party Defendants, Appellees.
 Nos. 83-1192, 83-1209.
 United States Court of Appeals,
First Circuit.
 Argued Aug. 2, 1983.
Decided Dec. 14, 1983.
 
 1
 Frank H. Handy, Jr., Boston, Mass., with whom Kneeland, Kydd & Handy, Boston, Mass., was on brief, for Iberbroker, S.A.
 
 
 2
 Francis J. Sally, Boston, Mass., with whom Thomas H. Walsh, Jr., James B. Re, and Bingham, Dana & Gould, Boston, Mass., were on brief, for SS Galicia and Compania de Navegacion Somerset, S.A.
 
 
 3
 Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and PEREZ-GIMENEZ,* District Judge.
 
 
 4
 PEREZ-GIMENEZ, District Judge.
 
 
 5
 This is an admiralty action brought in the United States District Court for the District of Massachusetts by the plaintiffs, Marcial Ucin, S.A. ("Ucin") and Schiavone-Chase Corporation ("Chase"), against the S.S. GALICIA, in rem, her owner, Compania de Navegacion Somerset, S.A. ("Somerset"), her time charterer, Perez y Compania ("Perez") and subtime charterer Iberbroker, S.A. ("Iberbroker"), to recover for loss of a cargo of steel turnings and expenditure claimed to have been made in discharging and disposing from the vessel the cargo of turnings. Vessel owner, Somerset, filed third party claims against time charterer Perez, subtime charterer Iberbroker, and voyage charterer Teccomex, S.A. ("Teccomex"). Iberbroker filed a counterclaim against Somerset and Chase for recovery of its discharge costs.
 
 
 6
 Trial before the United States District Court for the District of Massachusetts was held on January 16, 19-21, 1981. On July 21, 1981, the Trial Court issued its opinion dismissing plaintiff's complaint because the turnings were considered a hazardous cargo which self ignited with no party at fault. On August 28, 1981, plaintiff filed its motion for further findings seeking recovery of its share of the discharge costs. On December 28, 1981, the court issued its opinion finding Somerset liable to Chase and Iberbroker for the costs of cargo discharge. Somerset thereafter, on January 22, 1982, filed its motion to amend complaint to assert claims for breach of charter party against Perez and Iberbroker. Perez was defaulted on January 5, 1983, for failure to answer Somerset's interrogatories. Judgment was rendered on February 15, 1983, in favor of Chase against Somerset and in favor of Somerset on its third party claim against Perez and Iberbroker. No award was made for the loss of cargo nor for attorney's fees. On March 15, 1983, Iberbroker filed its notice of appeal to the United States Circuit Court of Appeals for the First Circuit from the judgment entered on February 15, 1983. Somerset filed another notice of appeal on the same date. The question on the appeal filed by Iberbroker relates to the personal jurisdiction over Iberbroker, the alleged breach of charter party agreement, the amendment of the complaint after the conclusion of trial, and the entry of default against Perez. The issue raised in Somerset's appeal is whether it, as owner of the GALICIA, has a right to recover attorney's fees and costs from the time charterers Perez and Iberbroker.[1]
 
 Statement of Facts
 
 7
 On April 6, 1973, Somerset, a foreign corporation organized under the laws of the Republic of Switzerland, owner of the S.S. GALICIA, entered into a time charter with Perez, a Spanish corporation, as charterer. On May 8, 1973, Perez subchartered the GALICIA to Iberbroker, another Spanish corporation, under an identical time charter agreement. Iberbroker, on February 18, 1974, voyage chartered the S.S. GALICIA to Teccomex, another Spanish corporation, to carry a cargo of metal turnings from Boston to Bilbao, Spain. Plaintiff Ucin, a Spanish steel manufacturer, was the purchaser of the cargo of metal turnings from voyage charterer Teccomex. Plaintiff Chase, a New York corporation, had sold the cargo of turnings to Teccomex. On or about February 26, 1974, Chase, as shipper of the cargo, delivered at its pier in Charlestown, Massachusetts, the metal turnings and loaded the same aboard the S.S. GALICIA. After loading was completed the GALICIA remained at the pier to comply with United States Coast Guard's Regulations which required the metal turnings to drop to a certain temperature before the vessel was allowed to sail. On March 11, 1974, fire erupted in the turnings stowed on GALICIA's hold. Several remedial steps were taken to cool and extinguish the fire. Among the steps taken were the application of carbon dioxide and the partial discharge of the cargo. After it became apparent that efforts to cool the cargo were unsuccessful, the Coast Guard ordered that the cargo of metal turnings be disposed of at sea. In order to comply with the Coast Guard's order a written agreement, dated April 11, 1974, was entered between Somerset, Chase and Iberbroker. Said agreement provided that Somerset, Iberbroker and Chase would advance on an equal basis costs and expenses to be incurred in the discharge and disposal of the cargo of metal turnings without prejudice to any rights of the parties. Somerset actually contributed $185,833.00, Chase $83,333.00, and Iberbroker $33,333.33. Discharge of the cargo was completed on May 15, 1974.
 
 
 8
 I. Was The Defense of Lack of In Personam Jurisdiction Waived by Iberbroker
 
 
 9
 Lack of personal jurisdiction is a privileged defense that can be waived "by failure [to] assert [it] seasonably, by formal submission in a cause, or by submission through conduct." Neirbo Co. v. Bethlehem Corp., 308 U.S. 165, 168, 60 S.Ct. 153, 155, 84 L.Ed. 167 (1939); see also, Ins. Corp. of Ireland v. Compagnies des Bauxites, 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1312 (1982); Leroy v. Great Western United Corp., 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979).
 
 
 10
 Rule 12(h)(1) of the Federal Rules of Civil Procedure does not call for the assertion of the lack of personal jurisdiction defense within the time provided in Rule 12(a).[2] It merely dictates that the defense will be waived if not made by motion or included in the responsive pleading.
 
 
 11
 Furthermore, it is well settled that general appearance by a defendant does not constitute a waiver of the defense of lack of jurisdiction over the person. 2A Moore's Federal Practice (2d Ed.) Sec. 12.12, at 2325, and cases cited at n. 17. However, if defendant appears, a subsequent contest of the court's jurisdiction over the person must be timely. Emerson v. National Cylinder Gas Company, 131 F.Supp. 299 (D.Mass.1955); Wyrough & Loser, Inc. v. Pelmor Laboratories, Inc., 376 F.2d 543 (3rd Cir.1967); Marquest Medical Products, Inc. v. EMDE Corp., 496 F.Supp. 1242 (D.Co.1980); 5 Wright and Miller, Federal Practice and Procedure, Section 1344, at 525, 526. But see, D'Amico v. Treat, 379 F.Supp. 1004 (S.D.Ill.1974). Otherwise, the movant would be guilty of laches. Vozeh v. Good Samaritan Hospital, 84 F.R.D. 143 (S.D.N.Y.1979); Bouas v. Sociedad Maritima San Nicholas, S.A., 252 F.Supp. 286 (S.D.N.Y.1965).
 
 
 12
 Iberbroker filed a general appearance through its attorney on May 24, 1974. On May 17, 1978, Somerset and GALICIA moved for entry of default judgment against Iberbroker for failure to answer the third party complaint. Soon thereafter, on May 26, 1978, Iberbroker filed a motion to dismiss the complaint, or in the alternative, motion for summary judgment. Iberbroker moved for the dismissal of the action on grounds that it was not subject to service of process within the District of Massachusetts and that it was not properly served with process.
 
 
 13
 Although it is true that Iberbroker did not file a motion under Federal Rule of Civil Procedure 12(b) nor a responsive pleading before its motion of May 26, 1978, it is undisputed that Iberbroker received actual notice of the action. During the time between Iberbroker's appearance and the filing of the motion to dismiss, Iberbroker's counsel attended some thirteen depositions in the case.
 
 
 14
 The objective of Rule 12 is to eliminate unnecessary delay at the pleading stage by requiring the presentation of an omnibus pre-answer motion in which defendant advances every available Rule 12 defense. 5 Wright and Miller, Federal Practice and Procedure, Sec. 1384, at 837 (footnote omitted); Rauch v. Day & Night Mfg. Corp., 576 F.2d 697 (6th Cir.1978). After filing an appearance and attending the taking of various depositions, and then four years later presenting the defense of lack of in personam jurisdiction, Iberbroker is trying to obtain the very delay which Rule 12 was designed to prevent. To hold that the privilege of lack of personal jurisdiction may be retained by an appearing defendant for as long as he does not file a pre-answer motion or responsive pleading would be "subversive of orderly procedure and make for harmful delay and confusion." Cf. Commercial Casualty Co. v. Consolidated Stone Co., 278 U.S. 177, 180, 49 S.Ct. 98, 99, 73 L.Ed. 252 (1929). (Statement made in relation to the privilege of venue).
 
 
 15
 Furthermore, similar to the cases of Spearman v. Sterling Steamship Company, Ltd., 171 F.Supp. 287 (E.D.Pa.1959) and Vozeh v. Good Samaritan Hospital, supra, plaintiffs herein may have been placed at a disadvantage by having to face the possibility that the Massachusetts statute of limitations might bar their claims.
 
 
 16
 We, therefore, conclude that Iberbroker's conduct was sufficiently dilatory and inconsistent with its assertion of lack of in personam jurisdiction to constitute a waiver of the defense.
 
 
 17
 II. Is Sub-Time Charterer, Iberbroker, Liable Under the Terms and Conditions of the Charter Party for the "Discharge Costs" Incurred by Chase and Somerset
 
 
 18
 The general scheme of a time charter is that the owner turns over a fully equipped ship to the charterer and operates the ship for the charterer's benefit being compensated by monthly hire. The owner pays the ordinary running expenses of the vessel and the charterer pays such of the expenses as are specifically incidental to the trade under which it employed her. Dampskibs Aktieselskabet Jeanette Skinner v. Munson S.S. Line, 20 F.2d 345 (2nd Cir.1927). In general terms, on most time charters, the owners pay the crews wages and supply their food, pay for engine room stores, keep the vessel repaired and pay for insurance, "almost everything else falls upon the charterer." Poor on Charter Parties and Ocean Bill of Lading, 1968 Ed., Sec. 7.
 
 
 19
 As stated by Benedict, under both time and voyage charters, the ship's owner is responsible for the loading and discharging of cargo. "Frequently, however, the charter party will expressly require the charterer to assume said duty ... [as in the instant case] in such the charterer will, of course, be liable for the service of his servants, or agent in causing damage to the vessel during the loading or discharging process." Benedict on Admiralty, Volume 2B, Sec. 11. Needless to say, when the charterer has undertaken the duty of loading and discharging under the charter party all expenses related to the same are for his account. See, 2B Benedict on Admiralty Sec. 10, Charterers General Obligations, and arbitration cases cited in footnotes 1 and 2 therein.
 
 
 20
 In the instant case the charter between both Somerset and Perez and Perez and Iberbroker are standard New York Produce Exchange Form time charters. Under said charter form, it is the charterers' responsibility to load and discharge the cargo at their own expense; to return the vessel shovel clean; and to return the vessel in good order and condition with the exception of normal wear and tear.
 
 
 21
 In the treatise "Time Charters", by Wilford Coghin and Healy (1978), in making reference to the standard Clause 8 of the New York Produce Exchange Time Charter (applicable in this case), which states that the charterers are to load, stow, trim and discharge the cargo at their expense and under the supervision of the captain, it is said:
 
 
 22
 The effect of the words is to shift from the owners to the charterers the primary responsibility for loading, stowing and trimming the cargo... where as is frequently the case, [as herein] the words "and discharge" are added after the word trim, it is clear that the primary responsibility is also put on the charterers.
 
 
 23
 The commercial objective of a time charter is to distribute the duties of the carriage of goods between the parties to a charter agreement on a particular vessel during certain period, so as to earn the maximum amount of freight for the benefit of said parties. This distribution of duties necessarily implies a division of the parties' responsibilities for the cargo and to third parties. Thus, the question as to whether the owner or the charterer bears the ultimate responsibility for loading and discharge costs, as well as for cargo loss, depends on who has agreed to perform the duty involved as per charter agreement.
 
 
 24
 Clause 8 provides on the one hand that not only is the captain under the orders and directions of the charterers as regards employment and agency, but that it is also the charterer's responsibility and duty to load, stow, trim and discharge the cargo at the charterer's expense under the supervision of the captain. A cursory reading of the language employed in this clause, i.e., "under the supervision of the captain", may give rise to doubts as to the division of said duties between the parties to the charter. Fortunately, this clause has been the object of extensive and uniform court interpretation which has clarified its meaning. The courts have interpreted this clause to mean that:The ship is the owner's ship, and the master and crew, his servants for all details of navigation and care of the vessel, but for all matters relating to the receipt of and delivery of cargo and those earnings of the vessel which flow into the pockets of the charterers, the master and crew are servants of the charterers.
 
 
 25
 Clyde Commercial, Ltd. v. U.S. Company (The Santona), 152 F. 516 (S.D.N.Y.1907). The full meaning of Clause 8 of the NYPE Charter Party Form has also been thoroughly analyzed in Canadian Transport Co. v. Corporation Line, Ltd., A.C. 934 (1940), when Lord Atkins explained:
 
 
 26
 Hence, it is well settled that liability for onboard stowage under the charter party agreement remains in the charterers, unless the master, acting in the performance of his duty regarding seaworthy or navigation, requires improper stowage against the charterer's wishes.
 
 
 27
 The United States Supreme Court has adopted this point of view Oxford Paper Co. v. The Nidarholm, 282 U.S. 681, 51 S.Ct. 266, 75 L.Ed. 614 (1931). Thus, if the loss is one which involves loading, stowing, trimming and/or discharge of cargo, and the charterer has agreed to perform those duties, then the charterer is liable for the costs involved even if it involves negligence on the part of the ship's crew, its officers and even the master. Nichimen Co. v. M/V Farland, 462 F.2d 319 (2d Cir.1972).
 
 
 28
 The Nichimen case serves to illustrate this principle. Briefly stated, the facts in this case show the consignee of the damaged steel coils brought suit against the shipowner and its time charterer. The shipowner contested its liability to the consignee and claimed indemnity from the time charterer based on the latter's failure to properly load and stow under Clause 8 of the NYPE Charter Party Form. The time charterer had entered into a contract of affreightment with the consignee and issued and signed bills of lading on behalf of the master. The coils were stowed aboard the vessel under the supervision of a specialist hired by the charterer's agent. While en route, the ship encountered a violent storm which caused extensive damage to the cargo. Furthermore, the cargo was rained on while it was being restowed by the charterer's agents at Vancouver. In an extensive opinion, the court held that the charterer must indemnify the owner for the damages resulting from improper stowage pursuant to Clause 8 of the NYPE Charter Party Form which, in effect, shifts the responsibility for proper loading, stowage and discharge of the cargo from the carrier to the charterer. See also, Horn v. Cia. de Navegacion Fruco, S.A., 404 F.2d 422, 433 (5th Cir.1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969); Fernandez v. Chios Shipping Co., Ltd., 542 F.2d 145 (2nd Cir.1976); L & L Marine Serv. v. Korf Transport Corp., 514 F.Supp. 378 (E.D.Miss.1981).
 
 
 29
 That there were unusually high discharge expenses in the instant case cannot relieve Iberbroker's responsibility to pay the same. Iberbroker cannot even argue that said discharge expenses were totally "unforeseeable" (not that it would be a defense), to the contrary, the charter of Iberbroker to Teccomex specifically allowed carrying cargo of metal turnings, a hazardous cargo which all parties know or should have known has a propensity to self-ignite (46 C.F.R. 146.27-28) without there being negligence or fault on any party (as in this case). So conscious was Iberbroker of the additional risks it was taking that its voyage charter with Teccomex stipulated an additional charter hire of $1.50 per ton if the cargo consisted of metal turnings.
 
 
 30
 Moreover, it would appear that Iberbroker in its brief concedes the obligation to pay the discharge and cleaning costs of the vessel under the previous cited terms of the charter party. In fact, Iberbroker does not raise as an issue that these costs are not recoverable under the charter, but instead argues that there was no evidence introduced at trial of the condition of the "SS GALICIA" at the time of the redelivery, if in fact the redelivery ever occurred. This argument would seem totally irrelevant inasmuch as it is undisputed that Chase made payments of $83,333.00 on account of "discharge", which it recovered from Somerset (and that Somerset made additional discharge payments of its own in the total amount of $185,833.00); in fact, Iberbroker made partial discharge payments in the amount of $33,333.00. It being undisputed that said amounts were expended as a result of the Coast Guard order to discharge and it further appearing that Iberbroker does not even dispute the obligation under the charter to pay discharge expenses and return the vessel shovel clean, there would appear to be more than ample evidence in the record for the trial court's imposition of contractual liability upon Iberbroker.
 
 
 31
 III. The Matter of Whether or Not Chase's Discharge Costs Can Be Construed to Give Rise to a Maritime Lien Against the Vessel for Necessary Services Has Not Been Raised on Appeal
 
 
 32
 Within the factual framework of this case the issue of the maritime lien of a cargo owner for discharge costs incurred by said cargo owner in removing or discharging his own cargo from the vessel because of an inherent vice of his own cargo is indeed a novel question. Particularly, in light of the fact that the court had already determined that none of the parties were at fault, and paradoxically went on to find that the costs incurred to extinguish the fire (which we believe benefited both ship and cargo) did not give rise to a maritime lien. This question, however, appears to be moot inasmuch as Somerset, who apparently raised said issue in its appeal, subsequently, during the pendency of the appellate proceedings, settled its dispute with Chase. Iberbroker on the other hand, who would appear to have standing to raise the issue (since it should not be held liable in indemnity or under the charter for any amounts Somerset paid Chase for the costs of the discharge which it was not required to pay by law), does not raise the issue for review on appeal.
 
 
 33
 To the contrary, in relation to the above, all that is raised by appellant is that there was no evidence of a breach of charter party introduced at trial, it concedes "that vessel's owner was under no obligation to Chase to assist in the discharge of the cargo". Not having raised the issue of the propriety of Judge Aldrich's finding that there was a maritime lien in Chase's favor for its expenditures in the discharge of cargo the appellate court does not now have to decide whether the discharge expenditures incurred by the shipper (Chase) constitute a maritime lien under the circumstances of this particular case.[3]
 
 
 34
 IV. Whether the District Court Erred in Allowing the Amendment of the Complaint by Somerset
 
 
 35
 Iberbroker complains on appeal that it was improper for the District Court to allow the amendments to the complaint requested by the shipowner, Somerset, and that it was prejudiced by it.
 
 
 36
 On its face this argument has some initial appeal due to the fact that it came one year after the trial was held. If the amendments were judged on this fact alone, it would seem that the proposed amendment was untimely.
 
 
 37
 However, from the part of the record that we were able to examine we think there is enough to sustain the District Court's exercise of discretion on this point. First, the proposed amendments sought to make sure that the record was clear what Somerset, the shipowner, was claiming against the charterers, Iberbroker and Perez, under a breach of charter theory, that which it might (would) have to pay to the shipper-cargo owner for the discharge costs. Iberbroker claims surprise and prejudice at the untimely request. But, it is a fact that the original third party complaint (filed on March 2, 1976) by Somerset against both Iberbroker and Perez invoked breach of charter party causes of action. This much is conceded by appellants at Page 14 of their brief on appeal. There is no real surprise.
 
 
 38
 Second, that there is no real surprise to Iberbroker is also shown by the fact that the trial court's several orders and opinions all make mention to the difficulties it had understanding what the parties actually sought from the court.[4] There is no doubt that this was the fault of the attorneys for the different parties. In this respect counsel for Iberbroker is not entirely without blame. But, it is a fact that shortly after the court entered its December 28, 1981, order (entered after reargument on the claims for recovery on the dumping and fire costs) the shipowner moved to amend its third party complaint to clarify what would seem obvious to us, that it was claiming indemnification against the charterers (owners of the cargo).
 
 
 39
 Third, the argument that the amendments were sought "a year after trial", is taken out of context. As stated before, the District Court concedes that it misunderstood exactly what the parties wanted. Between the time trial ended and the time the amendment was sought, most of the time was spent waiting for the District Court's rulings and then briefing various points the District Court wanted the parties to address.
 
 
 40
 Because the amended complaint was not prejudicial since Iberbroker knew that it was sued for breach of charter party from the beginning; because the breach of the charter party theory was part of the overall dispute that was presented at trial for resolution; and taking into consideration the several orders and memorandums that were filed and the fact that the proposed amendment came before a final judgment was ultimately entered, we find that the trial court did not abuse its discretion in permitting the amendment.
 
 
 41
 V. Was it Error to Enter Default Against Perez
 
 
 42
 The last point raised by Iberbroker is that it was an error to enter default against Perez. In examining this point we have trouble understanding the theory under which Iberbroker raises this issue and what it hopes to ultimately gain by it.
 
 
 43
 We cannot find anywhere evidence that Perez took an appeal from the judgment of the District Court. Appellees raised the lack of standing of Iberbroker to appeal the same.
 
 
 44
 We have previously held that "only a person who was a party to the proceeding below and who is aggrieved by the judgment or order is entitled to appeal." Securities & Exch. Comm'n. v. An-Car Oil Co., Inc., 604 F.2d 114, 119 (1st Cir.1979); see also, Torres v. Toledo, 586 F.2d 858, 860 (1st Cir.1978); Deposit Guaranty Nat. Bank v. Roper, 445 U.S. 326, 333, 100 S.Ct. 1166, 1171, 63 L.Ed.2d 427 (1979). The judgment is clear that Iberbroker was found independently liable to the shipowner. Under the reasoning of the District Court Iberbroker's liability does not depend upon whether Perez is or is not liable. On appeal Iberbroker does not challenge this rationale. While Iberbroker does challenge the finding that it had breached the charter party, it does not explain what this has to do with Perez.
 
 
 45
 Second, we find it hard to sympathize with a defendant who was served with proper summons sometime in the summer of 1978 and does not move for an extension to plead or move to dismiss, and indeed does nothing, until the winter of 1979, and then only after default had been requested. More startling to us is the fact that even after default had been requested, all that Perez did was to file a one-page motion stating only that: "2. This Court lacks jurisdiction over said defendant as will more fully appear."
 
 
 46
 On the record we cannot find anywhere that any attempt was ever made by Perez to support this with any memorandum of law or affidavits. Instead, it chose to remain silent. On June 18, 1982, the District Court entered an order hinting that it thought that jurisdiction might be lacking as to Perez, but that it would allow discovery on this point. The fact that Perez did not answer the interrogatories on jurisdiction was the "straw that broke the camel's back." Because it never squarely presented the issue of lack of personal jurisdiction to the District Court, it should not now be allowed to argue through Iberbroker that the District Court erred in entering default.
 
 
 47
 VI. Should Somerset Be Awarded Attorney's Fees and Costs
 
 
 48
 Somerset alleges that attorney's fees and costs should have been awarded against Perez and Iberbroker. Attorney's fees were not requested by Somerset, but by Chase. The District Court stated: "Chase also wishes attorney's fees. There is nothing exceptional about this case.... There will be no allowance in favor or against any party."
 
 
 49
 A general principle of appellate review is that an appellate court will not consider a legal issue or theory not presented to the trial court. In the absence of a miscarriage of justice a legal issue or theory not raised or presented in the lower court will not be considered for the first time on appeal. Roto-Lith, Ltd. v. F.P. Bartlett & Co., 297 F.2d 497 (1st Cir.1962); Greenwich Fed. S. & Assoc. v. Fidelity Bond & Mortgage Co., No. 82-1569 (1st Cir. June 15, 1983); Johnston v. Holiday Inns, Inc., 595 F.2d 890 (1st Cir.1979).
 
 
 50
 Justice will not be miscarried in view of the fact that no statutory authorization is provided for the award of attorney's fees to a party prevailing in a suit based upon Carriage of Goods by Sea Act, nor is there any other federal statute authorizing the award of attorney's fees in this type of admiralty proceeding. Noritake Co., Inc. v. M/V HELLENIC CHAMPION, 627 F.2d 724 (5th Cir.1980); American Union Transport Co. v. Aguadilla Terminal, Inc., 302 F.2d 394 (1st Cir.1962).[5]
 
 
 51
 For the reasons stated above, the decision of the District Court is affirmed.
 
 
 
 *
 Of the District of Puerto Rico, sitting by designation
 
 
 [1]
 Although the district court did not specifically address the issue of Somerset's attorney's fees Somerset argues that the language of the court's opinion dated January 5, 1983, 558 F.Supp. 299, that "[t]here will be no allowance of attorney's fees in favor of or against any party", clearly denies recovery of attorney's fees by any party
 
 
 [2]
 Rule 12(a) requires responsive pleading to be served within 20 days after the service of the summons and the complaint
 
 
 [3]
 For a lien to exist, Chase's expenditures would have to comply with the provisions of 46 U.S.C. Sec. 971, which states:
 Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel. (emphasis added)
 Even if it met the requirements of a maritime lien, the same could be found waived by showing that the party rendering the service relied solely on personal credit (of the owner or some third party) and not on the credit of the vessel. Burden of proof is on the one claiming waiver, Farrell Ocean Services, Inc. v. U.S., 681 F.2d 91 (1st Cir.1982). These were not addressed by the parties below. In any event, if the Court were to find that no lien exists, this would not resolve Somerset's "discharge" claim of $185,833 against Iberbroker based on the contractual terms of the charter. (See part "C" infra).
 
 
 [4]
 For example, the Court states in its October 21, 1981, Order: "It not having occurred to the court that there might be distinctions between [the different claims]...." In its December 28, 1981, Order the court states: "it was pointed out that I had misunderstood what had been disposed of by the settlement."
 
 
 [5]
 Although the above is true, we have previously acknowledged that "a court has inherent power in an admiralty suit to assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " Gradmann & Holler GMBH v. Continental Lines, 679 F.2d 272 (1st Cir.1982) (quoting F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). Nothing in appellant's brief is addressed to any party having acted in bad faith, vexatiously, wantonly or for oppressive reasons