**Barbara J. LESLIE, Plaintiff,**

v.

**ST. VINCENT NEW HOPE, INC., Daughters of Charity National Health System, Gail Languell and Gail Rowe, Defendants.**

No. IP 94–0922–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 19, 1995.

Michael C. Kendall, Kendall Law Office, Indianapolis, for plaintiff.

Stephen W. Lyman, Gregory P. Kult, Hall, Render, Killian, Heath & Lyman, P.C., Indianapolis, for defendants.

## ENTRY ON DEFENDANT LANGUELL'S MOTION TO DISMISS

HAMILTON, District Judge.

Plaintiff Barbara J. Leslie has sued her former employer, St. Vincent New Hope, Inc., its parent company, and two former supervisors, Gail Languell and Gail Rowe. Leslie has pleaded claims under the Americans with Disabilities Act and state tort law. Defendant Languell has moved for dismissal of all claims against her for failure of service. She has also moved for judgment on the pleadings as to Leslie's claim for tortious interference with her business relationship with her employer. (Languell calls the latter part of her motion a motion under Fed. R.Civ.P. 12(b)(6), but she has already answered. Therefore, she is seeking judgment on the pleadings under Rule 12(c).)

### Service of Process

█ Leslie filed her complaint on June 9, 1994. Defendant Languell appeared by counsel and then filed an answer on August 8, 1994. As her first affirmative defense, Languell asserted that this Court lacked jurisdiction over her because she had not been served with a summons or a complaint in this action. Under Fed.R.Civ.P. 4(m), if service is not made upon a defendant within 120 days after the filing of the complaint, the court "shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time...." Languell filed her motion to dismiss on November 18, 1994, more than 120 days after the complaint was filed. It is undisputed that Languell has never been served with a summons and complaint.

Leslie argues that Languell has waived any defect in service by appearing through counsel, filing an answer, participating in submitting a case management plan, submitting a preliminary witness and exhibit list, and submitting contentions, all before seeking dismissal. Leslie supports this argument with citations to decisions of Indiana state courts holding that activity like Languell's amounts to a waiver of insufficiency of service. Leslie also cites *Haedike v. Kodiak Research, Ltd.*, 814 F.Supp. 679 (N.D.Ill. 1992), for the proposition that a defendant's

general appearance amounts to a waiver of defects in personal jurisdiction, and argues that the reasoning of *Haedike* governs this case.

In *Haedike*, however, the court applied Illinois state procedural law to determine the consequences of a general appearance because the defendant had made the general appearance in state court, before the case was removed to federal court. 814 F.Supp. at 681–82. Leslie filed her case in federal court. The issue of waiver is therefore governed by federal law, including the provisions of Fed.R.Civ.P. 12(g) and (h), so the reasoning of *Haedike* does not apply here. Under Rule 12(h), a defense of insufficiency of process is waived "(A) if omitted from a motion in the circumstances described in subdivision (g), or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course." The "circumstances described in subdivision (g)" are a party's motion under Rule 12 that omits the defense of insufficiency of process where the defense is then available to the party (as it almost always would be). These provisions mean that Languell could preserve her defense as to insufficiency of process by including it in her answer, which she has done, and by including it in a Rule 12 motion, which she has also done.

If that were enough, however, Languell could have waited until the eve of trial, or the expiration of a relevant statute of limitations, before filing her motion to dismiss for insufficiency of service. The Seventh Circuit has explained that the defense of insufficiency of process "may be waived by 'formal submission in a cause, or by submission through conduct.'" *Trustees of Central Laborers' Welfare Fund v. Lowery*, 924 F.2d 731, 732 (7th Cir.1991), (quoting *Marcial Ucin, S.A. v. SS Galicia*, 723 F.2d 994, 996–97 (1st Cir. 1983), which in turn cited *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939) (defen-

dant's privilege to object to venue "may be lost by failure to assert it seasonably, by formal submission in a cause, or by submission through conduct")). In *Marcial Ucin*, the First Circuit explained that while a general appearance does not waive the defense (in that case, jurisdiction over the person), "a subsequent contest of the court's jurisdiction over the person must be timely." 723 F.2d at 997.

Rule 12 is designed to ensure that certain threshold defenses are addressed early in a case. *See Marcial Ucin*, 723 F.2d at 997. The rule does not authorize a defendant to preserve the defense by pleading it in an answer and then waiting to spring a trap late in the case. *See generally* Fed.R.Civ.P. 12(c) (motion for judgment on the pleadings must be filed "within such time as not to delay the trial"). In the *Marcial Ucin* case, the defendant had participated in the lawsuit for four years, and the delay in actually pursuing the defense put the plaintiff at a potential disadvantage. The First Circuit held that the defense had been waived by this conduct that was dilatory and inconsistent with the asserted defense. 723 F.2d at 997.

Pursuant to the Seventh Circuit's recognition of waiver of sufficiency of process by "submission through conduct" in *Trustees v. Lowery*, the same analysis applies here. Defendant Languell has participated extensively in preparing this case for trial. She has participated in developing the case management order and has submitted witness and exhibit lists and contentions. Although her participation has not been as extensive or as lengthy as the defendant's participation in *Marcial Ucin*, it has been substantial. Languell's participation in this case from the outset, well before the time for service had run, also shows that she has not been unfairly prejudiced in any way by the lack of service. Accordingly, the Court finds that Languell has waived the lack of service and denies Languell's motion to dismiss for insufficiency of service of process.[1]

---

1. Even if this Court did not find a waiver of the lack of service, the Court would not dismiss the claims against Languell on that basis. The advisory committee notes to Rule 4(m) state that the rule "authorizes the court to relieve a plaintiff of

the consequences of an application of this subdivision even if there is no good cause shown." Leslie has not shown good cause for the failure to obtain service. However, in view of Languell's extensive participation in the litigation of

### Tortious Interference with Employment

■ Languell also seeks judgment on the pleadings on Count Two of the Complaint, which alleges that Languell tortiously interfered with Leslie's contract of employment with St. Vincent New Hope. Languell argues that Indiana law does not allow a tortious interference claim against an agent for interfering with the plaintiff's contract with her principal so long as the agent was acting within the scope of her agency. In view of the familiar and stringent standard that governs motions for judgment on the pleadings, *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), a close examination of the allegations against Languell is necessary.

Languell was Leslie's supervisor at St. Vincent New Hope in 1991. Leslie alleges she asked Languell why she was not being paid in a timely manner for overtime she had worked. Languell failed to correct the problem, so Leslie spoke with defendant Gail Rowe, who was Languell's supervisor. Leslie alleges that Languell was angry that Leslie had gone over her head, and that in retaliation Languell assigned her to a much more strenuous position, working with nursing home patients who required more care and attention. Leslie further alleges that she was not properly trained for the heavy lifting in her new assignment, and that she injured her back in November 1992 while lifting a patient. After two or three months away from work, Leslie returned with a doctor's evaluation that she should not lift more than 15 pounds and should not do repetitive bending. Languell told Leslie that these physical restrictions could not be accommodated, and Leslie did not return to work. On January 27, 1993, Leslie returned to work with light duties, and on February 17, 1993, Leslie's doctor gave her a release to return to her previous job with no restrictions.

Leslie alleges she returned to work the next day, began caring for patients, and suffered a recurrence of back pain that made her unable to work. The doctor saw Leslie again and restricted her to no more than three patients per shift. Languell told Leslie that this restriction could not be accommodated. Leslie was given a permanent partial impairment rating of two percent and received a lump sum payment as worker's compensation. She then filed a grievance seeking to return to work consistent with her physical restrictions, but the grievance was denied. She met with St. Vincent New Hope's personnel department to request an assignment consistent with her physical restrictions. Leslie alleges Languell asked her to disregard her restrictions and to return to the strenuous position that Languell had originally assigned. Leslie refused. On May 25, 1993, defendant Rowe called Leslie, told her that she had been released from all physical restrictions, and that she should return to work the next day. Leslie refused, saying she needed a release from the doctor. When she did not report to work as ordered, she was fired.

■ Count Two is labeled "tortious interference with business relationship," but the text characterizes Languell's conduct as interference with a "contract of employment." While the difference between tortious interference with a contract and tortious interference with a business relationship can be significant in some situations, *see Furno v. Citizens Ins. Co.,* 590 N.E.2d 1137, 1140 (Ind. App.1992), the issues here do not turn on the difference. Under Indiana law, employment contracts can be the subject of claims for tortious interference even where the contract is terminable at will. *Bochnowski v. Peoples Federal Savings & Loan Ass'n,* 571 N.E.2d 282, 285 (Ind.1991).

Languell argues that Leslie has failed to state a claim upon which relief can be granted because she acted only as an agent of one party to the employment contract. Languell relies principally on *Kiyose v. Trustees of Indiana University,* 166 Ind.App. 34, 333 N.E.2d 886, 891 (1975), and *Martin v. Platt,* 179 Ind.App. 688, 386 N.E.2d 1026 (1979). In *Kiyose,* the plaintiff had not been reap-

---

this case on its merits and the lack of prejudice to her, even if there had been no waiver the Court would not dismiss the claims without prejudice, but would have directed plaintiff to effect

service on Languell within ten days. *See* Fed. R.Civ.P. 4(m). (Plaintiff may still find it advisable to effect such service now.)

pointed to a faculty position at Indiana University. He alleged, among other claims, that the trustees of the university had tortiously interfered with the prospective advantage he had through his relationship with the university and his expectation of promotion and tenure. The trial court granted a motion to dismiss for failure to state a claim upon which relief could be granted. The Indiana Court of Appeals affirmed, noting that a party's breach of its own contract is not actionable on a tortious interference theory. 333 N.E.2d at 891. The plaintiff argued that the trustees had been acting in their representative capacity for the university when they made statements creating an expectancy that he would be promoted and given tenure. But he argued that the trustees had acted "in their individual capacities" when they notified him he would not be reappointed to the faculty. The appellate court held, however, that "the non-reappointment of faculty members lay within the scope of defendants' official duties." *Id.* The appellate court acknowledged some contrary authority but held "in accordance with what we believe to be the better view, liability does not accrue for the performance of acts lying within the scope of the agent's duties." *Id.* (citing *Widger v. Central School Dist.*, 20 A.D.2d 296, 247 N.Y.S.2d 364 (1964)). Because the plaintiff had alleged only actions within the scope of the trustees' duties, the court affirmed dismissal of the claim. 333 N.E.2d at 891.

In *Martin v. Platt*, 179 Ind.App. 688, 386 N.E.2d 1026 (1979), the plaintiffs had reported to a company officer that their supervisor had been soliciting and receiving kickbacks from suppliers. The officer investigated the accusations, took no action against the supervisor, and discharged the complaining employees. The employees sued the supervisor and the officer for tortious interference with a business relationship, alleging that both had "intentionally and maliciously" caused the company to discharge them in retaliation for truthfully reporting the kickbacks, and in order to suppress the information the plaintiffs had obtained. The appellate court explained that an action for tortious interference

will not lie against a party to the contract. In addition, an officer or director of a corporation will not be held independently personally liable for inducing the corporations's breach of its contract, if the officer or director's action is within the scope of his official duties on behalf of the corporation.

In the present case it is undisputed that [defendants] Platt and di Scipio were the supervisors of [plaintiffs] Martin and Niemann. It is uncontroverted that the decision to hire and fire executive level employees at Magnavox rested with the employee's immediate superior. The discharges were within the scope of the duties of Platt and di Scipio, and no action will lie against them on the theory of interference with a contractual relationship. The trial court correctly held the officers were entitled to judgment as a matter of law.

386 N.E.2d at 1027 (citations omitted). The Indiana Court of Appeals reaffirmed this principle in *Biberstine v. New York Blower Co.*, 625 N.E.2d 1308, 1318 (Ind.App.1993) (officer or director not liable for inducing corporation's breach of contract if officer or director acted within scope of duties, citing *Martin* ).

*Martin v. Platt* directly addresses Leslie's principal argument in this case. She argues that Languell acted for improper personal motives when she retaliated against Leslie and refused to accommodate her physical restrictions: "But when she allowed her personal feelings of pride, jealousy, anger, revenge and malice to color her actions toward Leslie, she stepped outside her role as supervisor. She acted in a personal way against Leslie." Pl.Br. at 8–9. Leslie adds:

Although such standard management actions as hiring, firing, and transferring employees may fall within a supervisor's scope of employment, some acts may take on the nature of individual capacity due to the intent involved as depicted in [*Stropes v. Heritage House Childrens Center*, 547 N.E.2d 244 (Ind.1989) ].

Here, the transferral of Leslie to Alpha unit was not strictly within Languell's duties. And certainly asking Leslie to deny her physical restrictions was not

strictly within her duties. Those actions removed Languell from the scope of her duties because of her malicious and retaliatory intent.

Pl.Br. at 10. The *actions* attributed to Languell in the complaint are all obviously within the scope of a supervisor's duties—work assignments, failure to provide training, decisions about accommodation of physical limitations, and dismissal. Leslie's theory is that Languell's *motives* took her actions outside the scope of her employment. That theory conflicts directly with *Martin v. Platt,* in which the plaintiffs alleged that their supervisors intentionally and maliciously caused plaintiffs to be fired in order to suppress the damaging information they had obtained about the supervisors. 386 N.E.2d at 1027.

Leslie relies on *Fields v. Cummins Employees Federal Credit Union,* 540 N.E.2d 631 (Ind.App.1989). In *Fields* an employee alleged she had been sexually harassed by her supervisor. In a suit asserting several claims against both her employer and her supervisor, she included a claim against the supervisor for tortious interference with an advantageous business relationship. She alleged that her supervisor's actions "resulted in an oppressive and hostile working environment which interfered with her business relationship" with her employer, and that she had voluntarily accepted a demotion as a result of his actions. 540 N.E.2d at 641. The appellate court reversed summary judgment in favor of the supervisor, finding there were "genuine issues of material fact whether [the supervisor's] actions contributed to her decision to accept the demotion." *Id.* The *Fields* court did not address the issue whether the supervisor was acting within the scope of his duties, and there is no indication from the opinion that *Kiyose* or *Martin* was cited to the court.

Leslie also relies on a series of cases that considered whether employers were liable on a theory of respondeat superior for intentional torts committed by employees. One stark example is *Stropes v. Heritage House Childrens Center,* 547 N.E.2d 244 (Ind.1989). The plaintiff was a child with cerebral palsy. A nurse's aide responsible for feeding, bathing, and changing plaintiff sexually assaulted him. The issue in the patient's case against the employer was whether the sexual assault was within the scope of the employment of the nurse's aide. The Indiana Supreme Court reversed summary judgment for the employer and held that a jury could determine that the assault was within the scope of employment. The court explained that the episode had included many acts fully authorized by the employer—the nurse's aide stripped the sheets from the bed, and was authorized to undress the plaintiff, to touch his genitals and other parts of his body when bathing or changing his clothes, to comfort and assure him with a pat or caress if he became distressed, or to use physical force to restrain him if necessary. 547 N.E.2d at 249. While it was beyond question that the assault had not been authorized and was for the nurse's aide's own gratification, the court rejected the theory that such motives or purposes controlled the analysis:

> A jury presented with the facts of this case might find that Robert Griffin acted *to an appreciable extent* to further his master's business, that his actions were, *"at least for a time,* authorized by his employer, related to the service for which he was employed, and motivated to an extent by [his employer's] interests," and that therefore, his wrongful acts fell within the scope of his employment and Heritage should be accountable. Conversely, a jury might find that Griffin's acts were so "divorced in time, place and purpose" from his employment duties as to preclude the imposition of liability on his employer. *The nature of the acts were, at the very least, sufficiently associated with Griffin's authorized duties to escape dismissal on summary judgment.*

547 N.E.2d at 250 (citations omitted, emphasis added). *See also Kemezy v. Peters,* 622 N.E.2d 1296, 1298 (Ind.1993) (whether intentional torts by employee are within scope of employment is usually a question of fact but may be determined as a matter of law); *Perry v. Stitzer Buick, GMC, Inc.,* 604 N.E.2d 613, 617–18 (Ind.App.1992) (genuine issues of fact as to employer's "knowledge or countenance" of employees' racial discrimination required reversal of summary judgment for employer on employee's claim arising

from racial discrimination by fellow employees), *rev'd in part,* 637 N.E.2d 1282 (Ind. 1994).

■ Languell argues that the cases involving the employer's liability for an employee's intentional tort on a theory of respondeat superior do not govern the analysis of another employee's liability on a theory of tortious interference. Judge Miller's opinion in *Fields* shows how the phrases "scope of employment" and "course of employment" take on different shades of meaning depending on whether the issue is an injured employee's claim under the Worker's Compensation Act or the "fellow servant" rule under that Act, not to mention respondeat superior. *See* 540 N.E.2d at 635–38. Similarly, a comparison of the Indiana Supreme Court's opinions in *Stropes* and *Perry v. Stitzer Buick* shows that the standards of employer liability for employees' intentional torts are not the same for claims by employees as for claims by others, like the victim in *Stropes. Compare Perry,* 637 N.E.2d at 1287–89, *with Stropes,* 547 N.E.2d at 249–50. In any event, it seems clear from these cases that in any of these contexts, personal motives of an employee responsible for a tort are not sufficient by themselves to place the employee's actions outside the scope of his or her employment. And personal motives are the sole basis on which Leslie seeks to place Languell's actions outside the scope of her employment.

■ In applying the law of Indiana, this Court's duty is to "decide the matter in the way we divine that the highest state court would rule if the issue were squarely presented to it." *L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561, 574 (7th Cir.1993). The decisions of the intermediate appellate court "generally control unless there are persuasive indications that the highest state court would decide the issue differently." *Id.* In both *Kiyose* and *Martin,* and more recently in *Biberstine,* Indiana's intermediate appellate court squarely addressed and decided the issue presented here, and decided it as a matter of law. *Martin* decided the question in the face of similar accusations of wrongful motive and intent. Balanced against this authority is the

logic implicit in the terse portion of *Fields,* where the precise issue was neither raised nor addressed. The *Fields* court did not indicate it was considering this issue, let alone that it meant to overrule or disagree with *Kiyose* and *Martin.* The cases, including *Stropes,* that decide employers' liability for the intentional torts of their employees in other contexts do not allow an employee's motive alone to control whether an act is within the scope of employment, and do not conflict with the application of *Kiyose* and *Martin* here. In addition, the Indiana Supreme Court's opinion in *Bochnowski,* 571 N.E.2d at 284–85, which allowed claims against third parties for tortious interference with an at-will employment contract, indicated that the focus of the tort is to prevent unjustified interference *by third parties.* There is no hint that the court intended to treat supervisors and other agents of the employer as it would treat outsiders to the employment relationship.

■ There is also another, more fundamental reason that this Court believes *Kiyose, Martin* and *Biberstine* accurately state Indiana law on this question. Indiana continues to adhere to the doctrine of employment at will. Under that doctrine, employment for an indefinite term and not supported by independent consideration from the employee is presumed to be terminable at will, meaning the employee may be fired for any reason or for no reason. *Ryan v. J.C. Penney Co.,* 627 F.2d 836, 836 (7th Cir. 1980); *Jarboe v. Landmark Community Newspapers of Indiana, Inc.,* 644 N.E.2d 118 (Ind.1994); *Speckman v. Indianapolis,* 540 N.E.2d 1189, 1192 (Ind.1989). *Cf. Romack v. Public Service Co. of Indiana, Inc.,* 511 N.E.2d 1024, 1026 (Ind.1987) (employee provided independent consideration for promise of "permanent" employment). There are narrow exceptions when an employee is fired in retaliation for exercising a statutory right or for refusing to violate a law for which the employee might be held individually responsible. *See Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425, 428 (1973); *McClanahan v. Remington Freight Lines, Inc.,* 517 N.E.2d 390, 393 (Ind.1988). Despite the recognition of these exceptions, the

Indiana courts have repeatedly adhered to the common law presumption of employment at will. As recently as last month the Indiana Supreme Court described the presumption as "deeply rooted in Indiana jurisprudence," and said that it had been limited "only rarely." *Jarboe v. Landmark Community Newspapers,* 644 N.E.2d at 121. *Accord, Streckfus v. Gardenside Terrace Co-op, Inc.,* 504 N.E.2d 273, 275 (Ind.1987). When asked to change the rule or expand the exceptions, the Indiana courts have said that such a fundamental change in public policy must come from the legislature. *Morgan Drive Away, Inc. v. Brant,* 489 N.E.2d 933, 934 (Ind.1986); *Hamblen v. Danners, Inc.,* 478 N.E.2d 926, 929 (Ind.App.1985).

 Indiana's adherence to employment at will is relevant here because, as a practical matter, plaintiff's theory of tortious interference would create a huge new exception to the employment at will doctrine. The Court does not doubt that in many cases, a fired employee could allege and produce evidence that a supervisor made the decision for personal motives—allowed, in Leslie's words here, "personal feelings of pride, jealousy, anger, revenge and malice to color" the supervisor's attitude toward the employee. If such allegations of personal motives were enough to give the employee a cause of action—albeit against the individual supervisor rather than the employer—the landscape of Indiana employment law would shift dramatically. Such a shift may not be beyond the realm of possibility, but this Court cannot predict that the Indiana Supreme Court would take that step if it faced the issue today, *see Jarboe v. Landmark Community Newspapers,* 644 N.E.2d at 121 (limiting promissory estoppel remedy for at-will employee to damages from detrimental reliance, and excluding alteration of at-will employment status), and it is not the role of this Court to rewrite Indiana law, regardless of any views the Court may have on the advantages and disadvantages of the employment at will doctrine. *See generally Ryan v. J.C. Penney Co.,* 627 F.2d 836 (finding no conflict in Indiana law on employment at will doctrine); *Knight v. Pillsbury Co.,* 761 F.Supp. 618, 621 (S.D.Ind.1990) (declining to extend *Frampton* exception for retaliatory dis-

charge; expansions of exceptions must come from Indiana judiciary or legislature); *Gossage v. Little Caesar Enterprises, Inc.,* 698 F.Supp. 160, 163 (S.D.Ind.1988) (declining to recognize tort action by former employee for "negligent performance of employment contract"). Accordingly, because all the actions Leslie has attributed to Languell fell within the scope of her duties for St. Vincent New Hope, and because Languell's motives could not affect whether her actions were within the scope of her duties, Languell cannot be liable for tortious interference with Leslie's employment.

Defendant Languell's motion to dismiss all claims against her for lack of service is hereby DENIED. Languell's motion for judgment on the pleadings on Count Two is hereby GRANTED, and Count Two is therefore DISMISSED. No separate judgment shall be entered at this time, and the case shall proceed on Leslie's claims under the Americans with Disabilities Act and for retaliatory discharge.

So ordered.