STATE of Indiana, Appellant
(Plaintiff),

v.

MONTICELLO DEVELOPERS, INC.,
d/b/a Pro Care Development Center,
Appellee (Defendant).

No. 2–985–A–277.

Court of Appeals of Indiana,
Second District.

Jan. 20, 1987.

Linley E. Pearson, Atty. Gen., Michael Schaefer, Deputy Atty. Gen., Indianapolis, for appellant.

Marcus C. Emery, Bowman, Tucker & Emery, Nancy L. Broyles, McClure, McClure & Kammen, Indianapolis, for appellee.

BUCHANAN, Judge.

## CASE SUMMARY

Appellant-plaintiff State of Indiana (State) appeals from the trial court's grant of a motion for judgment on the evidence in favor of appellee-defendant Monticello Developers, Inc., d/b/a Pro Care Development Center (Monticello), claiming that the trial court erred in finding there was a lack of sufficient evidence to support a conviction of criminal recklessness.[1]

We reverse.

---

1. Ind.Code 35–42–2–2 (1982).

## FACTS

The facts stated in a light most favorable to the State show that the State filed a charge of neglect of a dependent [2] against North American Health Care, Inc., John Gans, President (North American); Monticello; Julie Plummer (Plummer) and Randy Lowery (Lowery) on September 26, 1983.[3] Pro Care Development Center (Pro Care), an intermediate care facility for the mentally retarded and the developmentally disabled, is located in Gaston, Indiana, and is the site of the alleged criminal act in this case.

On March 18, 1983, James E. Andrews (James), a profoundly retarded 42–year–old resident of Pro Care, was taken by Lowery, a developmental skills technician (DST) to the bathroom in the east wing of Pro Care for a bath at about 2:30 p.m. James was one of the lowest functioning residents at Pro Care, and had few expressive skills such as crying or talking. In fact, James was at the most basic level of training and was unable to bathe himself. It was the job of a DST to help the residents train in basic skills. Lowery removed James's pants, sat James on the toilet, and turned on the hot water to maximum pressure. Lowery tested the water with his finger and it was coming out hot. He did not adjust the temperature. Lowery left James alone in the bathroom and went to James's room to get clean clothes for James. On his return to the bathroom, Lowery met Plummer, an assistant program associate (APA), who offered to take over bathing James. Lowery estimated the sequence took two to five minutes.

Plummer then entered the bathroom, and took off James's socks. James then got into the bathtub, which was half full of water. Plummer left James alone in the bathroom to get a washcloth from a closet across the hallway. Plummer returned and saw that James had a bowel movement in the bathtub. Plummer again left the room to find Lowery to finish the bath. In all, James remained in the bathtub for five to eight minutes before Plummer asked Lowery to take over.

Lowery stood James up to rinse off the dirty water and noticed what looked like toilet paper wrapped around James's legs. Lowery sat James on the toilet and James grabbed his feet. Lowery then discovered the peeling was skin, not toilet paper.

James received severe burns to his hips, legs, and feet. James still has scars, has problems walking, and must wear shoes which are open at the toe.

At the jury trial beginning on January 22, 1985, Lowery testified he was never instructed on how to bathe residents but had been told briefly that he should not leave residents unattended in the bathroom. Lowery stated that before the incident, he had never been given a written copy of bathing procedures and had never heard of the nursing procedure manual, which was the only manual containing the bathing procedures. Bath thermometers were not used in the bathrooms.

Plummer was an APA who trained and assisted residents in daily living skills. Plummer stated she did have classroom instruction which covered bathing, dressing, and toothbrushing as part of a pre-basic training. She had not been trained on checking bath water or using bath thermometers, but had been in attendance at a meeting when she was instructed not to leave residents unattended while bathing. She and Lowery both stated that they knew by common sense to test the temperature of bath water and not to leave the residents unattended while the residents were bathing. Lowery and Plummer both read the policy manual which advised employees that it was against the law to abuse and neglect patients.

The State produced evidence at trial showing that James's injury was caused by

---

**2.** IC 35–46–1–4(a)(1982).

**3.** North American was found not guilty on January 31, 1985, at the jury trial. Plummer subsequently pled guilty to criminal recklessness on July 24, 1985. The charges against Lowery were dismissed. Therefore, this appeal only involves the corporate defendant, Monticello.

a scald burn. Willis Roush, from the State Board of Health, testified that a pair of James's socks was brought to him for chemical testing on March 21, 1983. The results indicated that the liquid from the socks showed the presence of no harmful chemicals. Connie Jarlsberg (Jarlsberg), the head nurse of the Wishard Hospital Burn Unit, recalled seeing James on March 19, 1983, in the burn unit. She classified his burns as deep, partial thickness burns, meaning that there was a chance they would heal. Based on the location and initial appearance of the burn, her opinion was that James's burns were caused from a scald. She stated that water at 130°F would take thirty seconds of exposure to produce the burn which James sustained. An emergency physician, Darrel Hofer (Hofer), working at the hospital where James was initially taken, also assessed James's burns as second degree, partial thickness burns caused from a scald.

Ten witnesses at trial stated that the east wing of Pro Care had problems in obtaining enough hot water for bathing. Mark Gilmore (Gilmore), Pro Care's maintenance supervisor, tested the water at the tap after the incident and found it to be lukewarm. On or about March 21, the temperature was checked at the tap with a thermometer, and measured at 130°F. The Code of Federal Regulations required the temperature not exceed 110°F. On inspection, Gilmore found that the hydroguard, an anti-scald device on the hot water heater which mixed hot and cold water so that the water would not exceed a certain temperature, was turned all the way up, and was faulty.

Extensive testimony was produced at trial concerning who was the actual owner of Pro Care. A field auditor from the Indiana Department of Public Welfare introduced the annual reports and articles of incorporation of North American and Monticello in order to show the connection between various enterprises and the involvement of John Gans (Gans), the president of Monticello, in them. The entity listed on various certification and transmittal letters introduced to show ownership was MDI Limited Partnership (MDI) d/b/a Pro Care, with the various partners' names included on the documents. Gans was a listed partner. An investigator for the Attorney General's office introduced an Assumed Name Certificate, signed by Gans, stating that the true names of all persons transacting business known as MDI was Gans and Monticello. All three entities had the same address. MDI's limited partnership certificate also showed Gans and Monticello as the general partners of MDI.

Monticello moved for a motion for judgment of acquittal, at the end of the State's evidence, and at the end of all the evidence. Both motions were denied. On January 31, 1985, the jury found Monticello guilty of criminal recklessness, a class B misdemeanor, and found North American not guilty. Monticello then filed a motion for judgment on the evidence.[4] On February 27, 1985, after hearing arguments, the court granted the motion, stating "there was a total lack of probative evidence sufficient to support a criminal conviction on the issue of recklessly, knowingly, or intentionally performing an act that created a substantial risk of bodily injury to James [E.] Andrews, the subject resident of Pro Care Development Center." *Record* at 1261.

## ISSUES

We have combined the two issues raised by the State into one issue as follows:

---

4. Ind. Rules of Procedure, Trial Rule 50(A) provides: "(A) *Judgment on the Evidence—How Raised—Effect.* Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict."

T.R. 50(B) states: "(B) *Jury Trial Subject to Entry of Judgment on the Evidence.* Every case tried by a jury is made subject to the right of the court, before or after the jury is discharged, to enter final judgment on the evidence, without directing a verdict thereon."

1. Did the trial court err in granting Monticello's motion for judgment on the evidence?

Pursuant to T.R. 59(G), Monticello raises three additional issues in its brief for our review:

2. Was the evidence sufficient to support a finding of criminal recklessness?

3. Did the trial court err in denying Monticello's motion to dismiss by finding that IC 35–41–2–3 (1982) was not unconstitutional?

4. Did the trial court err in giving instructions on the crime of criminal recklessness as a lesser included offense of neglect of a dependent?

### DECISION

*ISSUE ONE*—Did the trial court err in granting Monticello's motion for judgment on the evidence?

*PARTIES' CONTENTIONS*—The State contends that in setting aside the jury verdict, the trial court either acted as a thirteenth juror and erred in not ordering a new trial, or erred in its application of T.R. 50(B).

Monticello responds that the trial court properly granted its motion because the State failed to show the manner in which the burns were sustained, and that Lowery or Plummer possessed the culpable mental state to commit criminal recklessness.

*CONCLUSION*—The trial court erred in granting Monticello's motion for judgment on the evidence pursuant to T.R. 50(B).

 The trial court was not acting as a thirteenth juror. The thirteenth juror standard, which allows the trial court to weigh evidence and judge credibility in deciding whether to grant a new trial, cannot be applied in granting a motion for judgment on the evidence. *State v. Lewis* (1981), Ind., 429 N.E.2d 1110, *cert. denied,* 457 U.S. 1118, 102 S.Ct. 2931, 73 L.Ed.2d 1331. In this case, the trial court specifically stated it was acting under T.R. 50(B), which allows it to enter judgment in favor of a moving party. Unfortunately, the court did not specifically state its reasons for granting Monticello's motion; however, there is nothing in the record to show the court doubted the credibility of any of the witnesses and assumed the role of a thirteenth juror. *Cf. Lewis, supra* (court was concerned with conflicting evidence, repeatedly referred to conflicts in the testimony, and was unconvinced of defendant's guilt); *State v. Barnack* (1983), Ind.App., 453 N.E.2d 348 (court determined that witness was not credible and necessarily had to weigh the evidence to reach its conclusion).

 The trial court was, however, acting under the authority vested in it by T.R. 50 (A) and (B) when it granted Monticello's motion for judgment on the evidence. On an appeal from a ruling on a motion for judgment on the evidence, this court must consider only the evidence most favorable to the non-moving party, and the reasonable inferences to be drawn therefrom. *Jones v. Gleim* (1984), Ind., 468 N.E.2d 205. Judgment on the evidence is improper if there is *any* probative evidence or reasonable inferences to be drawn from the evidence or if reasonable persons would differ as to the result. *Jones, supra; Lewis, supra; Huff v. Travelers Indem. Co.* (1977), 266 Ind. 414, 363 N.E.2d 985. In order to properly grant a T.R. 50 motion there must be no substantial evidence or reasonable inferences to support the claim, i.e., "a complete failure of proof." *Lewis, supra* at 1116; *Carter v. State* (1984), Ind., 471 N.E.2d 1111. Thus, the State need only show a prima facie case in order to avoid a judgment on the evidence. *Jackson v. State* (1983), Ind., 446 N.E.2d 344; *Jones v. State* (1984), Ind.App., 467 N.E.2d 1236.

Since the trial court did not specify on what particular element the State failed to provide prima facie evidence, we must review the record to determine if the State offered *any* evidence to support each of the elements of criminal recklessness. Criminal recklessness occurs when a person, "recklessly, knowingly, or intentionally performs an act that creates a substan-

tial risk of bodily injury to another person." IC 35–42–2–2.

■ Lowery and Plummer were agents of Monticello, acting within their scope of authority. Under IC 35–41–1–22, a "person" includes a corporation. A corporation may be convicted of an offense only if the offense was committed by its agent acting within the scope of his authority. IC 35–41–2–3. The State showed that at the time of the incident Lowery was a DST and Plummer was an APA employed at Pro Care. The duties of a DST and an APA were shown to include helping the residents train in basic skills, which included supervising and giving baths. James's injury occurred in the bathroom, while Lowery and Plummer were performing an activity entrusted to them and required by their positions at Pro Care.

Monticello's agents acted recklessly by leaving James alone in a bathtub filled with hot water. A person acts recklessly if, "he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." IC 35–41–2–2(c). The evidence at trial showed that Lowery left James alone in the bathroom, while the hot water was running at maximum position. Plummer placed James in the water, and also left James unattended in the bathtub. A thermometer was not used to check the temperature of the water before James was placed in the bathtub. Lowery, however, had tested the water, found the water hot, and did not adjust the temperature before he left the bathroom. Lowery and Plummer knew that it was common sense not to leave a resident unattended, and to check the temperature of the water before placing a resident in the bath. Furthermore, they both knew that James was one of the lowest functioning residents at Pro Care. These facts constitute a prima facie showing of reckless behavior. *See Miller v. State* (1983), Ind.App., 449 N.E.2d 1119, 1121 (to prove intent under the criminal recklessness statute, it was sufficient to show the defendant "realized or should have realized that there was a strong probability that ... harm might result").

Likewise, this evidence also shows a substantial risk of bodily injury. Bodily injury is defined as "any impairment of physical condition, including physical pain." IC 35–41–1–4. The second degree, partial thickness burns sustained by James demonstrate more than a substantial *risk* of bodily injury, they show bodily injury itself. The State offered the opinions of Jarlsberg and Hofer, who classified James's injury as a scald burn. Contrary to Monticello's assertion, both Lowery and another Pro Care employee testified to the change in James's condition when they stated they saw what looked to be toilet paper wrapped around his legs after he got out of the water, which they later realized was James's skin. Furthermore, the water was tested after the incident and measured at 130°F. Sufficient evidence was presented to show that the act of placing James in the hot water and leaving him unattended created a substantial risk of bodily injury.

We conclude the State provided more than enough evidence to present a prima facie case of criminal recklessness.

*ISSUE TWO*—Was the evidence sufficient to support a finding of criminal recklessness?

*PARTIES' CONTENTIONS*—Monticello contends there was insufficient evidence to support the guilty verdict of criminal recklessness, claiming that the State failed to show the requisite mental intent, that James's injury was a scald burn, and that Lowery and Plummer were agents of Monticello and acting within their scope of authority.

The State responds that sufficient evidence was provided on each element of the charge.

*CONCLUSION*—There was sufficient evidence to sustain the jury verdict of criminal recklessness.

Our standard of review when the sufficiency of the evidence is challenged is well known by the parties. A conviction will be affirmed if, viewing the evidence most fa-

vorable to the verdict, there is substantial evidence of probative value from which the jury could reasonably infer that a defendant was guilty beyond a reasonable doubt. *Woods v. State* (1986), Ind., 491 N.E.2d 531; *Newton v. State* (1983), Ind.App., 456 N.E.2d 736.

■ There was sufficient evidence to show an existing agency relationship between Monticello and both Lowery and Plummer. The State offered numerous documents designed to demonstrate the close relationship among Gans, MDI, and Monticello. An assumed name certificate showed that the true names of all persons owning, conducting, or transacting business as MDI were Gans and Monticello. Gans and Monticello were the two general partners of MDI. The three entities had the same address. Gans testified that he and Monticello manage the business of MDI. *Record* at 448. From this evidence, the jury could reasonably have concluded that Lowery and Plummer were agents of Monticello, acting on behalf of Monticello and subject to its control with respect to the work which they performed. *See Lewis v. Davis* (1980), Ind.App., 410 N.E.2d 1363.

The evidence recited in the issue above also demonstrates the requisite mental intent involved in the crime of criminal recklessness. Monticello's agent, Lowery, acting within the scope of his duties, filled a bathtub with hot water, and left a profoundly retarded resident alone in the bathroom. Plummer, also acting within the scope of her duties, subsequently placed James in the water and left him unattended for an unspecified amount of time. Such conduct indicates conscious, unjustifiable disregard of the harm that might come to a retarded patient who has been placed in a bathtub filled with very hot water. Both of these staff persons were aware that James was a low functioning resident needing constant supervision, and knew or reasonably should have known their behavior was dangerous to life and limb. Whether harm was intended is irrelevant. *Miller, supra.* Harm resulted.

Monticello seeks to argue various aspects of the evidence, but as already indicated, there was evidence to support each element of Monticello's guilt of the crime of criminal recklessness.

*ISSUE THREE*—Did the trial court err in denying Monticello's motion to dismiss by finding that IC 35–41–2–3 was not unconstitutional?

*PARTIES' CONTENTIONS*—Monticello claims the trial court erred in overruling its motion to dismiss the information because the use of the term "scope of authority" in IC 35–41–2–3 renders the statute unconstitutionally vague.

The State argues that the statute is not unconstitutionally vague.

*CONCLUSION*—IC 35–41–2–3 is not unconstitutionally vague.

IC 35–41–2–3(a) provides that "[a] corporation ... may be prosecuted for any offense; it may be convicted of an offense only if it is proved that the offense was committed by its agent acting within the scope of his authority."

■ A statute is not unconstitutionally vague if persons of ordinary intelligence could comprehend it in order to inform themselves of the conduct sought to be proscribed. *State v. Downey* (1985), Ind., 476 N.E.2d 121. The language of a statute need only "convey sufficiently definite warning as to the proscribed conduct when measured by common understanding." *Rhinehardt v. State* (1985), Ind., 477 N.E.2d 89, 93. Every statute is presumed constitutional until clearly overcome by a showing to the contrary. *Ruge v. Kovach* (1984), Ind., 467 N.E.2d 673; *Northern Indiana Bank and Trust Co. v. State Bd. of Finance* (1983), Ind., 457 N.E.2d 527; *Lewis v. State* (1985), Ind.App., 484 N.E.2d 77, *trans. denied.* Words which might be indefinite when used in one sense will not invalidate the statute when they have a well-settled, common-law meaning. *W.R. LaFave and A.W. Scott, Jr., Criminal Law* § 11 (1971).

■ IC 35–41–2–3 became effective in 1977 and has not to date been constitution-

ally challenged. Nor has the phrase "scope of authority" been challenged as unconstitutionally vague. We conclude reasonable persons of common intelligence are capable of discerning what kind of conduct would generally fall within the proscriptions of this statute or could, with further inquiry, determine the meaning of the statute. Since the phrases "scope of authority" and "scope of employment" are used extensively in agency law and are defined through common law, fair warning of the proscribed conduct is given in order for a corporation to determine what kind of activity would fall within its agent's scope of authority. *See Restatement (Second) of Agency* § 228 (1958).

▌ We fail to see how the phrase "scope of authority" could be more precisely defined in this statute since what is within a particular agent's scope of authority depends on surrounding circumstances. *Penn Cent. Transp. Co. v. Reddick* (1979), D.C.App., 398 A.2d 27; *Adams v. South Carolina Power Co.* (1942), 200 S.C. 438, 21 S.E.2d 17; 21 *Am.Jur.2D Criminal Law* § 17 (1981) (less certainty is required in the language of a statute where the offense is difficult to define and it would be difficult "to lay down a rule of conduct in more exact terms which would at the same time cover varying conditions"). An examination of statutes from other states leads to the reasonable inference that the term "scope of authority" and similar terms "within the scope of his employment" or "in behalf of the corporation" are commonly understood and have widespread use. *See Del.Code Ann.*, tit. 11 § 281(3)(1979); *Ga.Code Ann.* § 26–803(a)(1)(1983); *Me. Rev.Stat.Ann.*, 17–A § 60(1)(B)(1983); *N.Y. Penal Law*, § 20.20(2)(c)(McKinney 1986); *Tex.Penal Code Ann.* § 7.22(a)(Vernon 1974); *Wash.Rev.Code*, § 9A.08.-030(2)(c)(1977). Not unlike the Indiana statute, none of these statutes offers a definition of the phrase.

The major risks involved in the administration of vague laws, e.g., unlimited discretion in the enforcement of the laws by the police and inability of the trial court to instruct the jury on the law, are not present here. *See W.R. LaFave and A.W. Scott, Jr., Criminal Law* § 11 (1971). We conclude the statute is not so overbroad as to lead to arbitrary and erratic enforcement, nor would a corporation be unable to determine when it may be held liable.

*ISSUE FOUR*—Did the trial court err in giving instructions on the crime of criminal recklessness as a lesser included offense of neglect of a dependent?

*PARTIES' CONTENTIONS*—Monticello asserts the trial court erred in giving four instructions which essentially stated the jury could find Monticello guilty of criminal recklessness as a lesser included offense of neglect of a dependent. Monticello argues criminal recklessness is not a lesser included offense, and even if it is, the information failed to charge, even tacitly, criminal recklessness.

The State answered that criminal recklessness is a lesser included offense, and that the language of the information shows the intent to charge on both the greater and lesser offenses.

*CONCLUSION*—The trial court did not err in instructing the jury that, as charged in this case, criminal recklessness was a lesser included offense of neglect of a dependent.

The charging information read as follows:

"Jack L. Stonebraker, Jr., swears that he is informed and believes North America[n] Health Care Inc., John Gans, president; Monticello Delvelopers [sic], Inc. D/B/A Pro Care Development Center, Rick Mohler, Administrator;; [sic] on or about the 18th day of March, 1983, at and in the County of Delaware, State of Indiana, did then and there unlawfully having the care, custody and control of a dependant [sic], to-wit: James Andrews, knowingly place the dependant [sic] in a situation that endangered his life and health, to-wit: placed him in a bath tub of hot water, said hot water at a temperature in excess of 110 degrees F., which resulted in serious bodily injuries to said James Andrews, to-wit: 2nd degree

burns over 20–30% of his body, contrary to the form of the Statute in such cases made and provided and against the peace and dignity of the State of Indiana."

*Record* at 1114.

 Monticello argues that criminal recklessness is not an inherently included offense of neglect of a dependent because the crime of criminal recklessness is not necessarily committed in the course of committing neglect of a dependent.[5] Indiana, however, recognizes that a lesser included offense may fall within the definition of section one of IC 35–41–1–16,[6] when it is an offense which is "factually included", i.e., charged in the information due to the manner in which the greater offense is committed. *See Maynard v. State* (1986), Ind., 490 N.E.2d 762; *Johnson v. State* (1984), Ind., 464 N.E.2d 1309; *Sering v. State* (1986), Ind.App., 488 N.E.2d 369. The manner in which the alleged neglect of a dependent occurred and the manner in which it was charged clearly fall within the definition of criminal recklessness since the alleged neglectful act by Monticello, i.e., placing James in a bathtub of hot water in excess of 110°F, was also an act creating a substantial risk of bodily injury to a person.

 In order to properly instruct on a lesser-included offense, the court must find that the charging instrument contains facts from which the intent to include the lesser offense can be found, and that the evidence presented would, prima facie, warrant a conviction on the lesser-included offense. *Outlaw v. State* (1985), Ind., 484 N.E.2d 10. The State has discretion in determining what charges will be made against a defendant, and can preserve the option to convict a defendant on a lesser offense in conformance with due process. *Dorsey v. State* (1986), Ind., 490 N.E.2d 260. Having found above that the State provided prima facie evidence of criminal recklessness, and that facts supporting the elements of criminal recklessness were alleged in the charging information, we conclude the trial court properly instructed the jury on the lesser-included offense. Here, the elements alleged in the information and the elements of criminal recklessness clearly coincided in order to give Monticello notice that criminal recklessness could be a lesser included offense. *See Johnson, supra* (defendant was put on notice he was charged with lesser included offense of battery when basic elements of the information and elements of battery coincided). The trial court did not err in instructing on criminal recklessness.

Thus, we arrive at the conclusion there was a factual basis for the jury's verdict of criminal recklessness, and that the trial court erred in granting Monticello's motion for judgment on the evidence. The trial court's judgment is reversed and this cause is remanded to the trial court to enter a judgment of guilty pursuant to the jury's verdict and the trial court is further directed to determine Monticello's penalty for the crime of criminal recklessness according to law.

SHIELDS, P.J., concurs.

SULLIVAN, J., concurs in result.

---

5. IC 35–42–2–2 states: "A person who recklessly, knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person, commits criminal recklessness, a class B misdemeanor." IC 35–46–1–4 provides that: "A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally: (1) places the dependent in a situation that may endanger his life or health ... commits neglect of a dependent, a class D felony."

6. An included offense is an offense that: "(1) is established by proof of the same material elements or less than all of the material elements required to establish the commission of the offense charged...." IC 35–41–1–16(1).