**TIPPECANOE BEVERAGES, INC.,**
**Plaintiff-Appellee,**

v.

**S.A. EL AGUILA BREWING COMPA-**
**NY, Defendant-Appellant.**

**No. 87–1542.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1987.

Decided Nov. 2, 1987.

Michael L. Muenich, Hand, Muenich & Wilk, Highland, Ind., for defendant-appellant.

Joseph P. Murdock, Smith & Murdock, Indianapolis, Ind., for plaintiff-appellee.

Before CUDAHY, POSNER and KANNE, Circuit Judges.

POSNER, Circuit Judge.

This appeal from a judgment for the plaintiff in a diversity suit requires us to consider issues of Indiana tort, contract, and agency law. The essential facts, construed as favorably to the plaintiff (since it won a jury verdict) as the record permits, are as follows. Early in 1984, Fred Zahrt, the president of Tippecanoe Beverages, Inc., an Indiana wholesaler of beer, read an advertisement in *Beer Wholesaler* magazine that had been placed by a Spanish brewer, El Aguila, which was seeking U.S. distributors for its Aguila [Eagle] Imperial beer. The advertisement indicated that anyone interested in a distributorship should get in touch with Alvin Epstein, doing business in Florida under the name Swiss Mint. (The collocation of ethnicities in this case is dizzying.) Later that year, at a convention of beer wholesalers in Las Vegas, Zahrt met Epstein and Alfredo Torres, an executive of El Aguila. Torres told Zahrt that Epstein was El Aguila's exclusive agent and representative in the United States and that Zahrt should deal only with Epstein since Epstein was con-

ducting all of the brewery's U.S. business. Torres also told Zahrt that Epstein had an office at the brewery in Spain; and indeed this office was listed, along with Swiss Mint's Florida address, on the business card that Epstein gave Zahrt. Torres solicited Zahrt to be El Aguila's Indiana distributor, and also told him to place his orders for El Aguila beer with Epstein. Shortly afterward, the Director-General of El Aguila wrote Zahrt certifying (as required by the Indiana Alcoholic Beverages Commission) that Swiss Mint "are the importers of our beer Aguila Imperial and Aguila Reserve for the United States of America and they have the authorization for the nomination of distributors thru out the United States."

Zahrt, deciding to buy beer from El Aguila, telephoned Epstein to place his order. Epstein told him he'd have to pay for the beer in advance, by cashier's check made out to Swiss Mint and sent to the Capital Bank in Miami. Shortly afterward, Zahrt received in the mail a document, in Spanish, on El Aguila's letterhead, captioned "factura pro-forma," which is Spanish for pro forma invoice. This document contained the figure $12,960, the price that Epstein had quoted Zahrt for the beer that Zahrt had ordered by phone. It also named both Swiss Mint and the Capital Bank. Upon receipt of the document (almost certainly from Epstein, though there is no direct evidence of this), Zahrt, without getting the document translated (he does not read or speak Spanish), sent a cashier's check for $12,960, made out to Swiss Mint, to the Capital Bank.

The beer never arrived, and in September 1985 Zahrt wrote El Aguila in Spain to find out what had happened. El Aguila answered him the following month, in a letter which said:

1. Mr. Epstein (Swiss Mint) was our importer and representative for the United States.

2. We received an order for a shipment to Tippecanoe Beverages Inc., but we did not accept that order, since we would not agree to the conditions. For that reason we did not make out the "factura proforma" in the amount of $12,960, a copy of which you sent us. Please inform us, if Swiss Mint put you in possession of the original of this "factura proforma", because we have a shrewd suspicion that this invoice has been "composed" by Swiss Mint, using parts of former letters of our Company, including a—cut out—seal of El Aguila S.A.

3. We are perfectly willing to help you to recover your money.

Epstein had vanished, presumably with the money; and El Aguila proved unwilling either to ship Tippecanoe the beer or refund the money that Tippecanoe had paid Epstein for it. So Tippecanoe brought this suit, which charges El Aguila with breach of contract and with conversion. The jury awarded Tippecanoe $21,000 under an Indiana statute that authorizes an award of up to three times actual damages for conversion. The judge added $7,980 in attorney's fees, under the same statute. El Aguila appeals.

If El Aguila induced in Zahrt a reasonable belief that Epstein was authorized to negotiate the terms of Tippecanoe's purchase of El Aguila beer and to receive payment from Tippecanoe for transmittal to Spain, then Epstein bound El Aguila to the contract that he made, and broke, to supply Tippecanoe with a quantity of El Aguila beer for $12,960. See Restatement (Second) of Agency, § 8 (and comments thereto) (1957); *Northwest Calf Farms, Inc. v. Poirier,* 499 N.E.2d 1165, 1167–68 (Ind.App.1986); *Storm v. Marsischke,* 159 Ind.App. 136, 138–39, 304 N.E.2d 840, 843–44 (1973); *Foss–Schneider Brewing Co. v. McLaughlin,* 5 Ind.App. 415, 418, 31 N.E. 838, 839 (1892). Under the facts we narrated, a reasonable jury could find that this is exactly what El Aguila did. El Aguila points out, however, that Zahrt's testimony about Epstein's representations concerning his authority is not admissible, under the exception to the hearsay rule for statements by an adversary's agent (Fed.R. Evid. 801(d)(2)(D)), to prove that Epstein was El Aguila's agent. That would indeed be boot-strapping, but it was not the purpose for which the testimony was offered.

Epstein's status as agent (actual or apparent) was established by Zahrt's testimony concerning what Torres had said to Zahrt and by the certification that El Aguila had mailed Zahrt from Spain. The testimony about Epstein's representations was then admissible under Rule 801(d)(2)(D) to show the precise scope of his agency and Zahrt's reasonableness in paying by cashier's check.

El Aguila's principal argument is that even if Epstein had apparent authority to contract on its behalf with Tippecanoe and did so by accepting Zahrt's check, Zahrt violated a condition of the contract by paying with a cashier's check rather than by letter of credit as specified (El Aguila contends) in the invoice. If Zahrt had paid by letter of credit it would have been less likely that Epstein could have made off with the money, though how much less likely is unclear. The invoice instructs Tippecanoe to make the letter of credit in favor of Swiss Mint and send it to the Capital Bank, although there is also a confusing reference to making "advance payment" to a bank in Spain upon receipt of shipment documents. However, we shall assume that one of the purposes of requiring a letter of credit in the invoice form that Epstein adapted to his own dishonest ends was—ironic though this is in the circumstances—to protect the seller, El Aguila, against its defalcating agent and that Zahrt's failure to comply with this condition enabled or facilitated Epstein's defalcation. We shall also assume that the Spanish words in the invoice, "credito bancario documentario irrevocable," which El Aguila's translator translates "irrevocable banking credit instrument," means letter of credit, though our Spanish dictionary gives "carta de credito" for letter of credit.

To the argument that El Aguila's breach of contract is excused by Tippecanoe's having violated a condition in the contract, a superficial reply is that since El Aguila has steadily maintained that Epstein forged the invoice it cannot consistently argue that the invoice imposed a contractual obligation on Tippecanoe. But Tippecanoe's contractual theory is that Epstein's conduct, however unauthorized and indeed criminal, created a contract between it and El Aguila which it is entitled to enforce; and Tippecanoe must take the bad with the good—contract duties with contract rights.

There are nevertheless two objections to El Aguila's attempt to use the letter of credit requirement in this manner that seem to us conclusive.

1. The condition is contained in a Spanish document that was placed in evidence without being translated into English. So far as appears, none of the jurors knows Spanish, so their failure to grasp the significance of the letter of credit provision cannot be used to invalidate the verdict. El Aguila does not argue that the provision required the judge to withdraw the case from the jury. It could not make such an argument—it didn't translate the document for the judge's benefit either. The document might just as well have been written in Egyptian hieroglyphics and placed in evidence in a trial completed before the discovery of the Rosetta Stone.

El Aguila made a translation for our benefit and stuck it in its brief as an exhibit, prompting Tippecanoe to move to strike the exhibit as an effort to introduce new evidence at the appellate level. See Fed.R. App.P. 10(a); *Ohio–Sealy Mattress Mfg. Co. v. Sealy Inc.,* 776 F.2d 646, 649 n. 1 (7th Cir.1985). The absurdity of El Aguila's ploy is underscored by the ineptitude of the translation, which leaves us uncertain whether the invoice required payment by letter of credit or by some other, unexplained, device. The motion to strike is granted.

2. Epstein told Zahrt to pay by cashier's check and followed up with an invoice, in a language that Zahrt could not understand, telling him to pay the same account in the same bank but with a letter of credit (if that is what it is) instead. It would have been unreasonable for Epstein, and hence for El Aguila (for we are treating Epstein as El Aguila's agent, as on the contract phase of this case we must do), to expect Zahrt to follow a written direction he could not understand instead of the oral direction he could understand. A condition that is in

a foreign language and that is contrary to oral instructions is the equivalent of a condition in fine print, offered to contradict the oral assurances of an agent. Such a condition is not enforceable. *Burns v. Rockford Life Ins. Co.*, 740 F.2d 542, 544 (7th Cir. 1984); see, e.g., *Silvestri v. Italia Societa per Azioni di Navigazione*, 388 F.2d 11, 17–18 (2d Cir.1968) (Friendly, J.); Calamari & Perillo, The Law of Contracts § 9–43(a), at p. 330 (1977). No more is the one here.

El Aguila has a further argument, however—that Zahrt acted unreasonably in paying an invoice that he could not understand. Although we can readily agree with the general proposition that one who signs a contract in a language that he does not understand acts at his peril, see *id.*, § 9–43(c), at pp. 333–34, El Aguila failed to establish that Zahrt's carelessness caused the loss of his money. The natural and reasonable thing for Zahrt to have done upon receipt of the invoice would have been to call Epstein and say, "I just received an invoice in Spanish—what does it mean?" To which Epstein undoubtedly would have replied, "It just confirms the terms we discussed on the phone, and instructs you to send a cashier's check to the Swiss Mint account in the Capital Bank." And Tippecanoe would thus have been bilked anyway. At all events, having failed to put an English translation before the jury, El Aguila is barred from arguing that Tippecanoe acted unreasonably in light of language in the invoice.

■ The most difficult question in the case relates to the claim for conversion, and is whether Tippecanoe is entitled to more than its actual damages. Section 34–4–30–1 of the Indiana Code provides in part that "if a person suffers a pecuniary loss as a result of [any of several criminal offenses, including conversion], he may bring a civil action against the person who caused the loss for the following: (1) An amount not to exceed three (3) times his actual damages. (2) The costs of the action. (3) A reasonable attorney's fee." Epstein indeed converted Tippecanoe's $12,960, but the suit is against El Aguila, and therefore cannot be maintained unless it complies with section 35–41–2–3(a) of the Indiana Code, which provides that "a corporation, partnership, or unincorporated association may be ... convicted of an offense only if it is proved that the offense was committed by its agent acting within the scope of his authority." Only if El Aguila itself is guilty of conversion can Tippecanoe obtain by virtue of section 34–4–30–1 up to three times its actual damages.

The combined effect of the two statutes is to create a statutory version of respondeat superior, cf. *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir.1986), a principle which, though more commonly used to impose liability on an employer for his employee's torts, can also be used to impose liability on a principal for torts committed by an agent within the scope of the agent's actual or apparent authority. See, e.g., Restatement, *supra,* § 265. Section 35–41–2–3(a) resembles the statute imposing civil penalties on the principal for an agent's acts (section 2(a)(1) of the Commodity Exchange Act, 7 U.S.C. § 4) that we discussed in *Rosenthal*. The difference is that the Indiana statute imposes criminal liability. The result is a strict-liability crime, since it is no defense that the principal was helpless to prevent the agent's crime which the statute imputes to the principal. But of course strict-liability crimes are not unknown, see, e.g., *New York Central & Hudson River R.R. v. United States*, 212 U.S. 481, 494, 29 S.Ct. 304, 306–07, 53 L.Ed. 613 (1909); LaFave & Scott, Handbook on Criminal Law 218–28 (1972), and if corporations are ever to be criminally liable, the element of strict liability is inescapable since the corporation itself (a locus of contracts) cannot be blameworthy in an intelligible moral sense. Nevertheless our limited canvass of comparable state laws suggests that section 35–41–2–3(a) has an unusually broad sweep. Compare Ill.Rev.Stat. ch. 38, ¶ 5–4(a)(1), and N.Y.Penal Law § 20.20(2)(c), both of which require that the agent must be acting "in behalf of" the corporation as well as within the scope of his authority or employment.

A second feature of the Indiana statute—that the principal is liable for dam-

ages punitive in character despite his lack of personal wrongdoing—is not novel. The majority rule at common law is that respondeat superior makes the employer or principal liable for punitive as well as compensatory damages for the employee's or agent's torts. See, e.g., *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145 (7th Cir. 1985); Prosser and Keeton on the Law of Torts § 2, at p. 13 (5th ed. 1984). But ordinarily the employer is liable for damages (whether actual or punitive) from an employee's *intentional* tort, such as conversion, only if the employee was acting not only within the scope of his employment but in furtherance of it—that is, only if the tort was intended, however misguidedly, to promote the employer's business interests, as where an overzealous employee beats up someone who owes his employer money, in an effort to collect it. See, e.g., *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807, 808 (7th Cir.1985); Prosser and Keeton, *supra*, § 70, at pp. 505–06.

This qualification is not in the text of the Indiana statute, as we have noted, but was read in by *Gomez v. Adams*, 462 N.E.2d 212 (Ind.App.1984). Adams sued Gomez, a security officer, and Gomez's employer, for various criminal acts, including theft and conversion. In the course of arranging the arrest of Adams (an unruly partygoer), Gomez had confiscated Adams' personal effects, including his check-cashing card, and had later used it to cash a stolen check, on which he forged Adams' name. The court held that the conversion, although not the forgery, was within the scope of Gomez's employment; it said, "even though the employee's predominant motive in performing the act is to benefit himself, the act may still fall within the 'scope of employment' if the employee's purpose, to an appreciable extent, was also to further his master's business." *Id.* at 223. Under the common law of Indiana at the time, a defendant who potentially was criminally liable for an act was not subject to punitive damages for that act, as distinct from the statutory treble damages involved in this case. The court in *Gomez*, implicitly determining that section 35–41–2–3(a) enacts respondeat superior in its common law sense, therefore

vacated the award of punitive damages. See 462 N.E.2d at 227. Another Indiana decision also holds that the statutory term scope of authority is to be understood in the common law sense. See *State v. Monticello Developers, Inc.*, 502 N.E.2d 927, 934 (Ind.App.1987).

It remains to be decided whether a reasonable jury could find that Epstein was acting to further, "to an appreciable extent, ... his master's business." The facts are similar to those of *Gomez*, where the court assumed that at the moment of seizing Adams' credit card Gomez had intended to keep it for his own use. See 462 N.E.2d at 224–25. Nevertheless, since it was Gomez's job to take Adams' personal effects for safekeeping during the scuffle and subsequent arrest, "the confiscation was undertaken in furtherance of [his employer's] business." *Id.* at 224. Likewise here, whatever Epstein had in mind when he received payment from Zahrt for the beer, the transaction (beer for money) was within the scope of a general agent's authority. It is true that in *Gomez* the agency was actual and here it may merely have been apparent, but we do not understand El Aguila to be arguing that the words "scope of authority" in the Indiana statute should be understood as limited to actual authority, and we therefore need not decide whether such an argument, if made, should be accepted. We add that the policy behind the doctrine of respondeat superior, that of encouraging employers and other principals to select their employees and other agents carefully, is fully engaged by holding El Aguila liable.

It is true as El Aguila notes that in a case decided after *Gomez*, by the Indiana Supreme Court, *Baxter v. Lyttle*, 475 N.E.2d 675, 677 (Ind.1985), the court held that another treble-damage statute of Indiana had to be construed narrowly because penal in nature. But the possible impact of this holding for the continued authority of *Gomez* is too conjectural to allow us to infer that the Indiana Supreme Court would reject *Gomez*, and unless we have a good reason to believe that the state's highest court would reject a deci-

sion by an intermediate court we treat that decision as authoritatively stating the law of the state. See, e.g., *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern Nat'l Ins. Group,* 750 F.2d 619, 624 (7th Cir.1984).

AFFIRMED.