**David A. STROPES, by next friend, Pamela TAYLOR, Appellant,**

v.

**The HERITAGE HOUSE CHILDRENS CENTER OF SHELBYVILLE, INC., and Robert Griffin, Appellees.**

No. 41S04–8912–CV–893.

Supreme Court of Indiana.

Dec. 5, 1989.

Rehearing Denied March 1, 1990.

James L. Petersen, Alan L. Weldy, Ice Miller Donadio & Ryan, Indianapolis, for appellees.

DeBRULER, Justice.

Fourteen-year-old David Stropes was the victim of cerebral palsy and severe mental retardation. He had the mental capacity of a five-month-old infant and was without the verbal and motor skills necessary to perform or assist in even the simplest tasks associated with his own sustenance or sanitation. David had been placed at the Heritage House Childrens Center of Shelbyville, Inc., (Heritage) as a ward of the Marion County Welfare Department to assure his maintenance, security, and well-being.

Robert Griffin, a nurse's aide employed by Heritage, was expected to feed, bathe, and change the bedding and clothing of residents, including David Stropes, as well as to monitor their comfort and safety. To fulfill these duties, Griffin was required to minister to residents in their beds, remove their clothing, and touch and handle their bodies. During his 11:00 p.m. to 7:00 a.m. shift on February 28, 1986, Griffin entered David's room to change the boy's bedding and clothes for the day. After Griffin stripped off the sheets, he got into bed with David and performed oral and anal sex upon him. Griffin stopped the assault when David made a sound indicating that he was in pain, then finished changing the boy's clothes. This incident was seen and reported by another Heritage employee, and Griffin ultimately was charged with and pleaded guilty to criminal deviate conduct, a Class B felony, and child molesting, a Class C felony.

David Stropes, by his next friend, Pamela Taylor, filed a complaint against Heritage and Griffin which asked for compensatory and punitive damages and which was based in part on a claim that Heritage was responsible for acts committed by Griffin while on duty. Heritage moved for summary judgment on that claim, arguing that this sexual assault was outside the scope of Griffin's employment and that, therefore, Heritage could not be held liable under the doctrine of respondeat superior. The trial

Douglas N. Ryan, George Clyde Gray, Gray Robinson Eckert & Ryan, Indianapolis, for appellant.

court granted that motion with no accompanying findings of fact or conclusions of law on May 29, 1987. On July 20, 1987, the trial court modified its initial order by adding the following conclusion of law:

That the act of committing a sexual assault was[,] as a matter of law, outside the scope of Robert Griffin's employment and, as a result, plaintiff cannot recover against The Heritage House, Inc. based upon a theory of respondeat superior.

David filed his motion to correct errors on September 17, 1987.

On the same day, David filed a motion for leave to file an amended complaint pursuant to Trial Rule 15(A). The new claim sought recovery under a theory of liability which would hold Heritage responsible for the wrongful acts of its employee regardless of whether the acts were within the scope of employment. The court allowed the amendment, to which Heritage filed a general denial. David's motion to correct errors was denied, and an appeal ensued. David petitioned for transfer to this Court after the Court of Appeals affirmed the decision of the trial court in an unpublished opinion. 531 N.E.2d 250. Transfer is granted.

■ Heritage argued as a preliminary procedural matter that the Court of Appeals was without jurisdiction because David had not timely filed his motion to correct errors. Under the rules of procedure in effect in 1987, the filing of a motion to correct errors within sixty days of the entry of a final judgment or appealable final order was an absolute precondition to any appeal.[1] T.R. 59(C). *See also City of Mishawaka v. Stewart* (1974), 261 Ind. 670, 310 N.E.2d 65 (filing of motion to correct errors within the prescribed time limit is a condition precedent to perfecting an appeal). Heritage argued that the trial court's initial order of May 29, 1987, set the sixty-day period running, that David's filing on September 17, 1987, came too late, and that his appeal was therefore barred. In its memorandum decision, the Court of

Appeals rejected this argument, finding that the initial order had not created an order from which an appeal could properly be taken under Trial Rule 56(D). That rule provides: "If on a motion under this [summary judgment] rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court ... shall thereupon make an order specifying the facts that appear without substantial controversy...." The Court of Appeals correctly held that because summary judgment was rendered on only one of David's claims, the trial court was required to specify the material facts not in controversy to bring its order into compliance with T.R. 56(D) and that the time for filing began to run on July 20, 1987, the date the modified order was entered. Therefore, David's motion to correct errors was timely filed and the appeal was properly before the Court.

■ A second procedural issue poses an apparent obstacle to consideration of the substance of this appeal. No formal judgment was entered with respect to the claim set forth in David's amended complaint, and this Court could refuse to reach the merits of this appeal on that basis.

Heritage denied the amended complaint's allegations, but filed no motion for summary judgment on the new claim. In fact, no action was taken on this claim at all until David's motion to correct errors was considered. David and Heritage then submitted researched statements in support of their positions, both of which focused almost exclusively on the new claim, and the trial court heard oral argument. Although the trial court's denial of the motion to correct errors was accompanied by no formal judgment on the amended complaint, it nevertheless effected a determination on the viability of that claim after an adversarial presentation of the issue.

The Court of Appeals gave express consideration both to the doctrine of respondeat superior as traditionally applied and to the imposition of liability as asserted in

---

**1.** T.R. 59(C) was subsequently amended to make the filing of a motion to correct errors a prerequisite to appeal only in those cases where the moving party bases his motion on either the discovery of new evidence or a claim that a monetary award is excessive or inadequate.

David's amended complaint and as briefed and argued below. The Court found neither theory viable and affirmed the trial court's decision. The trial court had obviously considered and determined the second claim, and the lack of a formal judgment by that court served as no impediment to the filing of extensive briefs and the issuance of a decision on the merits of that claim in the Court of Appeals. Nor does it here. *See First Equity Security Life Ins. Co. v. Keith* (1975), 164 Ind.App. 412, 329 N.E.2d 45 (where the substantive issue had been fully briefed and argued, the issue was clearly severable from those still pending in the trial court, and no prejudice would result to the parties by consideration of the merits, lack of a formal judgment did not bar review by appellate court). The law does not require the doing of a useless thing, and to remand this case to perform a charade of filing motions and entering orders on issues which have long since been determined would be a truly useless exercise in form over substance. Therefore, we now turn to the substantive issue of this appeal.

The question presented for our review is whether, as a matter of law, Heritage may be subject to liability for its employee's wrongful acts under the doctrine of respondeat superior as traditionally applied or under a theory of liability which has been described as the "common carrier" or "nondelegable duty" exception to respondeat superior. The trial court and the Court of Appeals found that neither theory had sufficient merit to escape summary judgment.[2]

When reviewing the grant of a summary judgment motion, the appellate court applies the same standard applicable in the trial court. *Brandon v. State* (1976), 264 Ind. 177, 179, 340 N.E.2d 756, 758. Summary judgment is proper only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Beckett v. Clinton Prairie School Corp.* (1987), Ind., 504 N.E.2d 552, 553. The contents of all pleadings, affidavits and testimony are to be liberally construed in the light most favorable to the non-moving party. *Id.* Even if the facts are not in dispute, summary judgment is inappropriate if conflicting inferences which would alter the outcome arise, *Bridgewater v. Economy Engineering Co.* (1985), Ind., 486 N.E.2d 484, 487, or if the trial court incorrectly applied the law. *Board of Aviation Comm'rs v. Hestor* (1985), Ind.App., 473 N.E.2d 151, 153. For the reasons stated below, we find that summary judgment was inappropriate for both claims and reverse.

■ Respondeat superior imposes liability, where none would otherwise exist, on an employer for the wrongful acts of his employee which are committed within the scope of employment. The Court of Appeals has stated, "In order to be within the scope of employment the employee must be in the 'service of the employer.'" *Shelby v. Truck & Bus Group Div. of GMC* (1989), Ind.App., 533 N.E.2d 1296, 1298. Acts for which the employer is not responsible are those done "on the employee's own initiative," *City of Crawfordsville v. Michael* (1985), Ind.App., 479 N.E.2d 102, 104, "with no intention to perform it as part of or incident to the service for which he is employed," *Gomez v. Adams* (1984), Ind.App., 462 N.E.2d 212, 223. However, an employee's wrongful act may still fall within the scope of his employment if his purpose was, to an appreciable extent, to further his employer's business, even if the act was predominantly motivated by an intention to benefit the employee himself. *Id.* Two cases decided under Indiana law have held employers liable for criminal acts of their employees, despite the fact that the crimes were committed to benefit the employee, because the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope.

In *Gomez v. Adams*, 462 N.E.2d 212, a security officer employed by a private se-

---

**2.** Because the trial court's denial of David's motion to correct errors had the same effect on the claim set forth in the amended complaint as did its grant of Heritage's summary judgment motion on the respondeat superior claim, the appropriateness of both rulings will be assessed under the principles associated with summary judgments.

curity agency arrested Adams and confiscated his personal identification. The agency's officers were authorized "to request, receive and retain personal identification while investigating disturbances or in effecting arrests," *id.* at 223, and to retain confiscated items until turning them over to the agency office, which was to be done as soon as practicable. Officers were not authorized to retain items for their personal use. *Id.* This officer kept Adams's confiscated identification past the end of his shift and later used it to cash a check to which he had forged Adams's name. Adams sued the security agency under the doctrine of respondeat superior for damages arising from the conversion of his identification and the forgery of his signature. The jury found for Adams and awarded him $80,000 in compensatory and punitive damages.

Although the Court of Appeals reversed the judgment, the security agency was not totally freed from liability. The Court found that the forgery was, as a matter of law, outside the scope of the officer's employment because it was "divorced in time, place, and purpose from [the officer's] employment duties" and because the only connection between the forgery and the employer was that the officer "was enabled to commit the act by virtue of his confiscation of Adams' papers while performing his duties as a security officer." *Id.* The security agency did not escape liability for the conversion, however, because "[t]here was sufficient evidence for the jury to reasonably conclude that [the officer] was within the scope of his employment when he converted the check-cashing card to his own use." *Id.* at 225. In reaching its decision, the Court of Appeals distinguished *Eagle Machine Co., Inc. v. American Dist. Telegraph Co.* (1957), 127 Ind. App. 403, 140 N.E.2d 756, where a business which sold and provided maintenance service for alarm systems was held not to be liable under respondeat superior for thefts committed by its employees against one of its customers. The Court stated:

In *Eagle Machine,* the duties of the employees did not include confiscation or retention of property, nor were the employees authorized to handle business property or inventory with the exception of the alarm system. Furthermore, the nature of their acts were [sic] entirely different than the service for which they were employed, and were motivated entirely by personal interests rather than the employer's interest. *Eagle Machine* is inapplicable to the instant case because [the officer's] actions were, at least for a time, authorized by his employer, related to the service for which he was employed, and motivated to an extent by [the agency's] interests.

*Gomez,* 462 N.E.2d at 224–25. The judgment in *Gomez* was reversed and the cause remanded for a new trial, not because respondeat superior did not apply to these circumstances, but because the jury had rendered a general verdict and the Court could not presume that the jury premised its verdict on the appropriate grounds. *Id.* at 227.

The Seventh Circuit Court of Appeals, sitting in diversity, relied on *Gomez* to decide a respondeat superior claim in *Tippecanoe Beverages v. S.A. El Aguila Brewing Co.,* 833 F.2d 633 (7th Cir.1987) (Posner, J.). The Seventh Circuit affirmed a judgment against El Aguila based on the conversion by one of its employees of a cashier's check given by Tippecanoe Beverages in payment for a shipment of beer. The Court found that a reasonable jury could find that the employee had acted to further, "to an appreciable extent, ... his master's business," analogizing the facts at hand to those in *Gomez:*

[S]ince it was [the officer's] job to take Adams' personal effects for safekeeping during the scuffle and subsequent arrest, "the confiscation was undertaken in furtherance of [his employer's] business." Likewise here, whatever [El Aguila's employee] had in mind when he received payment from [Tippecanoe Beverages] for the beer, the transaction ... was within the scope of [his] authority.

*Id.* at 638.

It is significant that neither of these cases was dismissed on summary judgment. Both factual episodes involved au-

thorized acts unquestionably within the scope of employment, the confiscation of identification pursuant to arrest and the acceptance of money given in payment for goods, and unauthorized acts unquestionably outside the scope of employment, the criminal conversion of items rightfully received, yet the employers were not automatically shielded from liability. The plaintiffs sought to impose liability under respondeat superior for crimes clearly committed ultimately to benefit the employee rather than the employer, yet the doctrine did not insulate the employer from subjection to trial. Instead, both cases went to the jury for a determination of whether the employees acted to further, "to an appreciable extent, ... his master's business." *El Aguila*, 833 F.2d at 638; *Gomez*, 462 N.E.2d at 224.

The question of employer liability under respondeat superior here should have gone trial as it did in *Gomez* and *El Aguila*. Like the employees in those cases, Heritage's employee committed some acts unquestionably within the scope of his employment. Griffin began the episode by performing a fully authorized act, stripping the sheets from David's bed prior to changing the bedding. He was also authorized to undress David Stropes and to touch his genitals and other parts of his body when bathing him and changing his clothes. Had David been distressed or frightened, the nurse's aide could have appropriately offered comfort and assurance by a pat or a caress; had he been violent or resistant, Griffin could have used appropriate physical force to restrain him. Griffin also ended the episode with a fully authorized act, dressing David for the day. Like the conversions committed by the *Gomez* and *El Aguila* employees, it is beyond question that the abuse David suffered at Griffin's hands was unauthorized by Heritage and committed for Griffin's own gratification.

The fact that this was a sexual assault is not per se determinative of the scope of employment question. A blanket rule holding all sexual attacks outside the scope of employment as a matter of law because they satisfy the perpetrators' personal desires would draw an unprincipled distinc-

tion between such assaults and other types of crimes which employees may commit in response to other personal motivations, such as anger or financial pressures. Rather, the nature of the wrongful act should be a consideration in the assessment of whether and to what extent Griffin's acts fell within the scope of his employment such that Heritage should be held accountable.

Rape and sexual abuse constitute arguably the most egregious instances of wrongful acts which an employee could commit on the job and lend themselves to arguably the most instinctive conclusion that such acts could never be within the scope of one's employment, yet other courts have recognized that the resolution of the question does not turn on the type of act committed or on the perpetrator's emotional baggage accompanying the attack. Rather, these courts indicate that the focus must be on how the employment relates to the context in which the commission of the wrongful act arose. The Minnesota Supreme Court has gone so far as to say that "the employee's motivation should not be a consideration" at all in determining the imposition of liability. *Marston v. Minneapolis Clinic of Psychiatry* (1982), Minn., 329 N.W.2d 306, 311. There, a mental health facility was held liable under respondeat superior for sexual improprieties committed by one of its doctors who exploited the physical and emotional access to two patients afforded by their association through the clinic. The Court stated, "[I]t is both unrealistic and artificial to determine at which point the [acts] leave the sphere of the employer's business and become motivated by personal animosity—or ... an improper, personal benefit." *Id.* (quotation and citation omitted).

In *Lyon v. Carey*, 533 F.2d 649 (D.C.Cir. 1976), a customer was raped by a deliveryman following an argument over the terms of the delivery. The scope of employment question was found to be "a question of fact for the trier of fact, rather than a question of law for the court, whether the assault stemmed from purely and solely personal sources or arose out of the con-

duct of the employer's business." *Id.* at 655. The Court stated that cases of this sort "are decided on the basis that a master is liable for an assault *arising out of*, and committed *in the course of* the employment, even though it is accompanied by or motivated in part by emotions of passion, savagery or personal revenge," *id.* at 654 (emphasis in original), and found that it was the jury's job to determine whether the assault was "the result of only propinquity and lust" or whether it "stemmed from job-related sources," *id.* at 655.

A jury presented with the facts of this case might find that Robert Griffin acted to an appreciable extent to further his master's business, *El Aguila*, 833 F.2d at 638, that his actions were, "at least for a time, authorized by his employer, related to the service for which he was employed, and motivated to an extent by [his employer's] interests," *Gomez*, 462 N.E.2d at 224–25, and that, therefore, his wrongful acts fell within the scope of his employment and Heritage should be accountable. Conversely, a jury might find that Griffin's acts were so "divorced in time, place and purpose" from his employment duties as to preclude the imposition of liability on his employer. *Id.* at 223. The nature of the acts were, at the very least, sufficiently associated with Griffin's authorized duties to escape dismissal on summary judgment. The trial court's entry of judgment for Heritage on that motion is therefore reversed.

■ Finally, we consider the propriety of the trial court's summary dismissal of David's amended complaint. David argued below that by virtue of the nature of its business, Heritage assumed a non-delegable duty akin to that imposed on common carriers to care for and protect him, thus subjecting itself to that extraordinary standard of care which renders common carriers liable for injuries inflicted on passengers by their employees regardless of whether those acts fall within the scope of employment. David cited *Rabon v. Guardsmark, Inc.,* 571 F.2d 1277 (4th Cir. 1978), for its discussion of non-delegable duties and the common carrier exception to the doctrine of respondeat superior. The Fourth Circuit quoted extensively from the Restatement (Second) of Agency[3] and Prosser,[4] and the key concepts may be summarized as follows: First, once one has, by contract or otherwise, assumed the duty to protect another, the nature of that duty may be such that the responsibility for providing the protection cannot be delegated even though the protective tasks themselves are. The plaintiffs in *Rabon* and here asserted that the assumption of

---

3. The Court cited § 214 to define non-delegable duties, quoted in pertinent part as follows:

> A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.
>
> . . . .
>
> By contract . . . or by entering into certain relations with others, a person may become responsible for harm caused to them by conduct of his agents or servants not within the scope of employment. . . . [O]ne may have a duty to see that due care is used in the protection of another, a duty which is not satisfied by using care to delegate its performance to another but is satisfied if, and only if, the person to whom the work of protection is delegated is careful in giving the protection. [This] duty of care is non-delegable.

*Rabon*, 571 F.2d at 1280 & n. 2 (quoting Restatement (Second) of Agency § 214 & comment a (1958)) (emphasis omitted).

4. The Court described the common carrier exception to respondeat superior as follows:

> Even where the servant's ends are entirely personal, the master may be under such a duty to the plaintiff that responsibility for the servant's acts may not be delegated to him. This is true in particular in those cases where the master, by contract or otherwise, has entered into some relation requiring him to be responsible for the protection of the plaintiff. The employees of a carrier, for example, would be under a duty to a passenger to exercise reasonable care to protect him against assaults on the part of third persons, even for personal motives, and they are not less under a duty to protect him against their own assaults, which is the duty of the master as well. It follows that the master will be liable even for such entirely personal torts as the rape of a passenger. The same is true of innkeepers and hospitals. (Footnotes omitted.)

*Rabon*, 571 F.2d at 1280–81 n. 4 (quoting W. Prosser, Law of Torts § 70 at 465 (1971)).

this non-delegable duty to protect is inherent in the very nature of certain kinds of businesses. Second, where an employer has assumed a non-delegable duty to protect a person and his employee inflicts injury on that person, the doctrine of respondeat superior will not interdict the imposition of liability on the employer even if the wrongful act was outside the scope of employment.

The Fourth Circuit found that South Carolina law would not support the imposition of liability on the employer in *Rabon*, and both Heritage in its brief and the Court of Appeals in its decision discuss the case at length and rely for their conclusions on its holdings. Guardsmark, Inc., was a private security agency hired by Lola Rabon's employer to provide protective and security services for its employees and property. Rabon was raped by one of the guards employed by Guardsmark who was on duty on her employer's premises, and she sued Guardsmark for monetary damages. The material facts of *Rabon* and the case at hand are very similar. In both, plaintiff sought a civil remedy against an enterprise engaged in the business of providing security and care to an identifiable class of people for a sexual assault perpetrated by one of enterprise's employees against one of the class to be protected. However, this factual similarity does not warrant adopting the Fourth Circuit's ultimate conclusions as our own since one of the fundamental bases supporting that decision is not applicable here.

*Rabon* was in federal court on diversity jurisdiction, and the issues were to be resolved under South Carolina law. *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The district court determined that South Carolina courts would find no liability on the part of Guardsmark under the doctrine of respondeat superior as traditionally applied. It went on to find, however, that South Carolina recognizes the principle of non-delegable duties and imposes this higher standard of care on common carriers, and that security agencies like Guardsmark would be subject to liability under the common carrier exception to respondeat superior. *Rabon*, 571 F.2d at 1279.

The Fourth Circuit reversed, finding no indication in South Carolina's statutory [5] or case law that the state's Supreme Court would extend the common carrier exception to encompass other enterprises. *Id.* at 1282. The Fourth Circuit stated that while the standard of liability is settled, the reasons underlying South Carolina's adoption of the exception were unclear, noting that the "cases that discuss the higher standard of care of common carriers seem to consider the principle as axiomatic." *Id.* at 1281 & n. 5. The Court stated that it "lack[ed] a reasoned basis on which to conclude that the South Carolina Supreme Court would be persuaded to extend [the common carrier exception] to private security agencies." *Id.* at 1281.

Indiana's common law has long recognized the extraordinary standard of care imposed on common carriers: "One of the prime duties resting upon a [common carrier] is to protect its passengers from assaults and injuries by its servants, nor does the question of its liability for a breach of this duty depend upon whether or not the servant, in the performance of the act, is within the scope of his employment." *Indianapolis Union Ry. Co. v. Cooper*

<hr>

5. The district court had found that extensive statutory regulation of private security companies indicated that South Carolina law would treat such companies as it does common carriers. *Rabon*, 571 F.2d at 1281. The Fourth Circuit took note of the South Carolina Supreme Court's usual deference to the state legislature in matters involving a change in the common law, *id.* at 1281–82, and refused to infer an intention by the legislature to impose a higher standard of civil liability on private security agencies from the adoption of these regulations, *id.* at 1281. The Fourth Circuit found, rather, that the statute merely established a licensing scheme. *Id.* David Stropes advanced a similar argument, urging that the Indiana Health Facilities Law and regulations promulgated under it, I.C. 16–10–4–1 *et seq.;* 410 I.A.C. 16.2 *et seq.,* indicates a strong state policy favoring stringent control over health facilities, thereby imposing on them a non-delegable duty of care. The Court of Appeals correctly rejected this argument, finding that the provisions, which address licensing, residents' rights and nursing procedures, do not impose by implication a higher standard of liability on health care facilities.

(1893), 6 Ind.App. 202, 205, 33 N.E. 219, 220. Unlike South Carolina, however, Indiana has identified the principles underlying its adoption of the exception, and, in fact, has extended it to reach enterprises other than common carriers.

In *Dickson v. Waldron* (1893), 135 Ind. 507, 34 N.E. 506, *reh'g denied* 135 Ind. 524, 35 N.E. 1, a theater manager was found to be liable to a patron for injuries sustained from a beating inflicted by an employee. This Court analogized the theater's responsibilities toward the patron to those of a common carrier toward its passenger, and explicated the reason that some kinds of enterprises are held to a higher standard of care:

> The treatment due from a carrier to his passenger, from an innkeper [sic] to his guest, and from a theatrical manager to his patron, while perhaps differing in degree, is similar in kind.
>
> . . . .
>
> [N]o rule is better established than that a principal is responsible for the acts of his agent performed within the line of his duty, whether the particular act was or was not directly authorized, and whether it was or was not lawful.
>
> But common carriers, inn-keepers, merchants, managers of theaters, and others, who invite the public to become their patrons and guests, and thus submit personal safety and comfort to their keeping, owe a more special duty to those who may accept such invitation. Such patrons and guests have a right to ask that they shall be protected from injury while present on such invitation and particularly that they shall not suffer wrong from the agents and servants of those who have invited them.

*Id.* at 516, 520, 34 N.E. at 509, 510 (citations omitted).

The concept of control is common to the theoretical underpinnings of both the doctrine of respondeat superior and its common carrier exception. Two traditional rationales underlying the doctrine of respon-

deat superior are that the employer is properly held accountable, first, because the servant acts upon an implied command from his master and, second, because the master is presumed to exercise control over the behavior of his servant. *Prosser and Keeton on Torts* § 70 at 502 (5th ed. 1984). *See also National Can Corp. v. Jovanovich* (1987), Ind.App., 503 N.E.2d 1224, 1233 n. 13 (corporation liable under respondeat superior on a showing that the employee was acting pursuant to the employer's direction or acting as the corporation's alter ego). Although these rationales are based on fictions said to arise from the employment relationship itself, they are in accord with the "general common law notion that one who is in a position to exercise some general control over the situation must exercise it or bear the loss." *Prosser and Keeton* § 69 at 500.

The imposition of liability under the common carrier exception is premised on the control and autonomy surrendered by the passenger to the carrier for the period of accommodation. This Court in *Dickson* stated that an enterprise which has induced an individual to give over the control of his personal comfort and safety to its care assumes a special duty to protect him from injury, particularly from its own employees. The *Rabon* court noted reasons also implicating the concept of control which other jurisdictions often identify as principles underlying the extraordinary liability imposed on common carriers. *Rabon,* 571 F.2d at 1281 n. 5 (citations omitted).[6] First, the contract of passage between the carrier and the passenger is said to contain an implied assurance that the passenger will be transported safely. This entails an implied promise by the carrier that it will control the environment in which the passenger finds himself so as to ensure his safety since, by subjecting himself to its care, the passenger has given up his ability protect himself by absenting himself from dangers encountered for the duration of

---

**6.** A distinct rationale underlying the exception is that "[c]ommon carriers are thought to be charged with public responsibilities; the strin-

gent standard of care is therefore imposed as a matter of public policy." *Rabon,* 571 F.2d at 1281 n. 5 (citation omitted).

the passage.[7] Second, the special duties of the common carrier are said to arise from the fact that the passenger has entrusted his safety, as a bailor entrusts his goods, to the custody and safekeeping of the carrier. The carrier, like the bailor, is to exercise control over the "goods" which have been confided to its care and over the circumstances in which they are found so as to ensure their security.

Under respondeat superior, employer liability is coextensive with the powers and advantages engendered by the employment relationship. Because liability is predicated conceptually on the employer's ability to command or control his employee's acts, an employer can be held responsible only for those acts of his employee which are committed within the scope of their employment relationship. Under the common carrier exception to respondeat superior, however, the range of employee activities deemed to be under the employer's dominion is irrelevant. Liability is predicated on the passenger's surrender and the carrier's assumption of the responsibility for the passenger's safety, the ability to control his environment, and his personal autonomy in terms of protecting himself from harm; therefore, the employer can be held responsible for any violation by its employee of the carrier's non-delegable duty to protect the passenger, regardless of whether the act is within the scope of employment.

The *Rabon* decision cannot be advanced as persuasive authority justifying the summary dismissal of the claim set forth in David's amended complaint, as the reasoning which cut off Rabon's pursuit of a claim based on the common carrier exception in South Carolina courts actually supports the pursuit of such a claim in Indiana courts. The Fourth Circuit found no articulated reasons for the adoption of the common carrier exception in South Carolina's common law and no basis to support its extension to other kinds of enterprises. Indiana's common carrier exception to respondeat superior, by contrast, is premised on the ceding of power to ensure one's safety and protection from an individual to the enterprise which purports to provide it, and the exception, again by contrast, has been applied to enterprises other than common carriers. Therefore, the only question remaining is whether an extension of the exception is justified here.

This Court has stated that "[t]he duty to exercise care for the safety of another arises as a matter of law out of some relation existing between the parties, and it is the province of the court to determine whether such a relation gives rise to such duty." *Miller v. Griesel* (1974), 261 Ind. 604, 611, 308 N.E.2d 701, 706. The resolution of this legal question, however, cannot be reached by a mechanical categorization. An examination of the relevant relationship here against the template of the common carrier exception and the rationales underlying it reveals that Heritage clearly assumed a non-delegable duty to be responsible for the care and safety of David Stropes. When Heritage accepted David as a resident of its facility, it was fully cognizant of the disabilities and infirmities

7. The Supreme Court of Massachusetts analogized a hospital's contract with its patient to a common carrier's contract with its passenger to find a hospital liable for the theft of a patient's jewelry from her person while under the effects of anesthetic in *Vannah v. Hart Private Hospital* (1917), 228 Mass. 132, 117 N.E. 328. The Court stated that the hospital would have been liable had a stranger attacked plaintiff while its nurses did nothing to protect her and that "there is as much a violation of the duty owed by the defendant under the contract where the attack upon the person or larceny of the ring is committed by one of the defendant's own nurses (whose duty is was to protect the plaintiff).... [S]ince the plaintiff had lost the use of her senses, [she] had ceased to be in charge of the ring and the defendant had as matter of law assumed the entire charge of the ring was well as the plaintiff's body...." *Id.,* 117 N.E. at 329–30 & n. 11. The Court indicated that since the agreement of the parties anticipated that the plaintiff would be disabled from guarding her own security, the hospital had assumed a duty to protect her while under that disability:

> The general control of the hospital was in the defendant.... [T]he consideration paid ought, as a matter of business, to secure some protection to the plaintiff where the condition of being under the influence of ether, to which she was expected to conform, put it out of her own power to look after her effects herself.

*Id.,* 117 N.E. at 329 n. 12.

he suffered which rendered him unable to care for himself and which, in fact, undoubtedly formed the basis of their relationship. Their "contract of passage" contemplated that the entire responsibility for David's comfort, safety and maintenance would be on Heritage and that the performance of these tasks would be delegated to its employees. Given the degree of David's lack of autonomy and his dependence on Heritage for care and the degree of Heritage's control over David and the circumstances in which he found himself, we find that Heritage assumed a non-delegable duty to provide protection and care so as to fall within the common carrier exception. The standard of care which Heritage owed to David, therefore, was that actual care be used by Heritage and its employees to provide that protection. The trial court was in error to summarily reject his claim that such a duty existed.

David Stropes has lodged two claims against Heritage which are conceptually distinct, and he should be allowed to proceed to trial on both. The point of similarity between respondeat superior and its common carrier exception is control; the point of distinction between the two is the focus of inquiry. The significant relationship in respondeat superior analysis is that of the employer and his employee, and the imposition of liability is premised on the control that the one may exercise over the other. Under the claim set forth in his original complaint, David must show that the acts committed by Robert Griffin fell within the range of circumstances and activities over which Heritage would be expected to exercise control or direction such that Heritage may rightfully be held liable. When analyzing the common carrier exception, the significant relationship is that of the carrier and its passenger, and the imposition of liability is premised on the control that is surrendered to the one by the other. Under the claim set forth in his amended complaint, David must show that the protection afforded him by Heritage fell short of the extraordinary standard of care which is imposed by the common carrier exception and which it assumed when it accepted David as a resident.

The opinion of the Court of Appeals is vacated, the trial court is reversed, and this cause is remanded with instructions to grant David's motion to correct errors and to proceed to trial on all claims in a manner not inconsistent with this opinion.

SHEPARD, C.J., and DICKSON, J., concur.

GIVAN, J., dissents with separate opinion, in which PIVARNIK, J., joins.

ON CIVIL PETITION TO TRANSFER

GIVAN, Justice, dissenting.

I respectfully dissent from the majority opinion in this case in that they hold the common carrier exception to the principle of *respondeat superior* should be applied to such institutions as nursing homes and hospitals.

The majority recognizes that the case of *Rabon v. Guardsmark, Inc.* (4th Cir.1978), 571 F.2d 1277 closely parallels the factual situation in the case at bar. There, the Fourth Circuit reversed the federal district court and held that the common carrier exception to the doctrine of *respondeat superior* should not be applied in this factual framework.

The majority attempts to distinguish *Rabon* in pointing out that the federal court relied upon what it perceived the South Carolina law to be; that is, that South Carolina courts would find no liability on the part of the defendant under the doctrine of *respondeat superior* as traditionally applied. The federal court went on to hold that this was a case of diversity jurisdiction and that they were bound to apply what they perceived to be the South Carolina law.

The majority in the case at bar reasons that the Indiana law is not comparable to the South Carolina law and that the "common carrier exception" should be applied in this case. However, the majority is not able to rely on precedent to support this conclusion but effects the extension of the common carrier doctrine to cases of this sort in this case. I cannot join the majority

in making such a wide-sweeping addition to the substantive law of this state.

The majority opinion establishes a major difference in the law of this state affecting every health care and custodial institution and virtually makes each of those institutions an insurer of the safety of the persons under their care and control. If such a wide-sweeping change in the substantive law is to take place, it should be done by the legislature and not by the judiciary.

Inasmuch as the Court of Appeals' opinion in this case was not published, I feel compelled to observe that the Court of Appeals' opinion fully discussed *Rabon, supra* and, after so doing, followed the same format and refused to extend the "common carrier exception" to the case at bar.

I believe the Court of Appeals properly addressed the issues in this case and did not err in affirming the trial court. I would therefore deny transfer in this case.

PIVARNIK, J., concurs.