**L.N.K., A Minor of the age of seventeen years By Robert KAVANAUGH and Jennifer Kavanaugh, Parents and next Friends; Robert Kavanaugh and Jennifer Kavanaugh, in their own Right, Appellants–Plaintiffs,**

v.

**ST. MARY'S MEDICAL CENTER, Mulberry Center, Appellees– Defendants.**

No. 82A01–0210–CV–417.

Court of Appeals of Indiana.

March 19, 2003.

John D. Clouse, Ivan A. Arnaez, Evansville, IN, Attorneys for Appellants.

R. Thomas Bodkin, Michael G. Smith, Bamberger, Foreman, Oswald and Hahn, Evansville, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

Appellants-plaintiffs L.N.K., Jennifer Kavanaugh, and Robert Kavanaugh (Kavanaughs) appeal the grant of summary judgment to appellees-defendants St. Mary's Medical Center and Mulberry Center (the Center). Specifically, the Kavanaughs argue that the trial court erroneously found that seduction is not an actionable tort in Indiana. The Kavanaughs also allege that the trial court erred in holding that the Center is not vicariously liable for Sean Lehman's seduction of L.N.K., the Kavanaugh's minor daughter who went to the Center seeking help for drug abuse. Concluding that the Center is not vicariously liable for Lehman's actions, we affirm.

### FACTS

The facts most favorable to the Kavanaughs reveal that Mulberry Center, which was owned by Welborn Baptist Hos-

pital at the time the facts constituting this suit occurred, is an institution offering mental health and addiction treatment to children and adults on both an inpatient and outpatient basis.[1] Sixteen-year-old L.N.K. entered the Center on an inpatient basis on three separate occasions due to drug addiction: December 22 through December 29, 1998; February 4 through February 9, 1999; and February 28 through March 5, 1999. During the first occasion, L.N.K. was a patient in the Center's "lockup" unit, which meant that she was not able to leave the unit. During the following two occasions, L.N.K. lived at the Center but was able to attend meetings and take part in supervised activities outside of the Center. On all occasions during which she was an inpatient, L.N.K. had to abide by the Center's rules, such as an evening curfew, which was enforced by the Center's nurses. Appellees' App. p. 17.

Sean Lehman was employed at the Center as a Substance Abuse Technician. His duties were limited to taking patients' vital signs, dispensing meals, and coordinating patient travel to and from treatment meetings. Center policies forbade any physical contact between staff and patients, and rules expressly prohibited romantic relationships between staff and patients because such relationships might jeopardize treatment goals.

During L.N.K.'s second stint at the Center, she met Lehman. L.N.K. testified that Lehman "started telling me how pretty I was and 'you have the prettiest eyes I've ever seen' and 'you're driving me crazy' and all stuff like that." Appellees' App. p. 57. Lehman kissed and hugged her on several occasions. According to L.N.K., during this time the two discussed seeing each other romantically after L.N.K. was

no longer a patient. Appellees' App. p. 38. L.N.K. stated that Lehman even entered her room one evening. Appellees' App. p. 59.

When L.N.K. returned to the Center the third time, Lehman continued to kiss and hug her. According to L.N.K., she saw Lehman nearly every day she was there. Appellees' App. p. 30–31. The day after L.N.K. emerged from her third and final stint as an inpatient at the Center, she and Lehman went out on a date. Lehman went to L.N.K.'s home that day and met Mr. and Mrs. Kavanaugh. Approximately three days later, L.N.K. and Lehman engaged in sexual intercourse for the first time. L.N.K. testified that Lehman was the first man she had ever had sex with. Appellees' App. p. 25.

Even after her discharge from the Center's inpatient services, L.N.K. continued at the center on an outpatient basis. She would meet with a counselor twice a week and attend weekly group meetings. L.N.K. usually did not see Lehman during her counseling visits to the Center because Lehman worked at night and L.N.K.'s visits occurred during the day. However, L.N.K. would attend a Friday night meeting, and she would meet Lehman at a certain location in the Center. He would kiss her and sometimes "make me go out to his car and wait for him to get off work and then we would leave together." Appellees' App. p. 14.

During the course of their relationship, Lehman attempted to keep the entire matter shielded from the Center. According to L.N.K., "he didn't want to go anywhere public like that because he was afraid that, you know, someone might see and he would lose his job." Appellees' App. p. 19.

---

**1.** By the time this action was filed, Mulberry Center was wholly-owned by St. Mary's Medical Center. Throughout this opinion, the term "the Center" is used to refer to the combined entity of Mulberry Center and St. Mary's.

According to L.N.K., even Mr. and Mrs. Kavanaugh "didn't think I was dating [Lehman]. They thought that he was taking me to meetings to help me get clean." Appellees' App. p. 29.

Three months after leaving the Center's inpatient program for the third time, L.N.K. became pregnant. She did not tell anyone at the Center for fear that Lehman would lose his job. Lehman asked L.N.K. to marry him after she became pregnant, but a marriage never occurred. During her pregnancy, L.N.K. was unable to help her mother around the house as she normally did and was hospitalized twelve times due to pregnancy complications. She went into labor prematurely six times. Finally, she delivered a son. Three days after L.N.K.'s son was born, Lehman went to the hospital to see the baby. During the following three weeks, Lehman sporadically visited L.N.K. at her home. After this time, Lehman left and was not seen again.

On May 18, 2001, the Kavanaughs filed their amended complaint against the Center. L.N.K. claimed injury for her seduction and argued that the Center was vicariously responsible for Lehman's actions. Appellant's App. p. 12. Mr. and Mrs. Kavanaugh claimed injury for the loss of L.N.K.'s "love, affection, performance of 'chores' and all other things children do for parents." Appellant's App. p. 12. On March 19, 2002, the Center filed its motion for summary judgment. Following a hearing, the trial court granted the Center's motion for summary judgment on August 26, 2002. The Kavanaughs now appeal.

## DISCUSSION AND DECISION

We first note that we are presented with two issues. One of the Center's grounds for summary judgment—and one of the trial court's findings—is that seduction is not an actionable tort in Indiana. The second issue we consider is whether the Center may be vicariously liable for the seduction of L.N.K. by one of its employees.

### I. Standard of Review

When this court reviews a trial court's ruling on summary judgment, it applies the same standards in deciding whether to affirm or reverse summary judgment. *Creel v. I.C.E. & Assoc., Inc.,* 771 N.E.2d 1276, 1279 (Ind.Ct.App.2002). We will not weigh evidence but construe the facts in the light most favorable to the nonmoving party. *Id.* Summary judgment should be granted only if the designated evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). On appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* The party appealing the grant of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was improper. *Jordan v. Deery,* 609 N.E.2d 1104, 1107 (Ind.1993).

### II. Seduction

■ The Kavanaughs argue that the trial court erred in holding that Lehman's actions did not constitute an actionable tort. In its brief, the Center argues that no such cause of action as seduction of a minor existed at common law. Appellees' Br. p. 9. The Center's position is incorrect. The Kavanaughs are not without remedy in that a valid cause of action for seduction of a minor may lie against Lehman.

■ We first observe that statutes in derogation of the common law are to be strictly construed. *SLR Plumbing & Sewer, Inc. v. Turk,* 757 N.E.2d 193, 199 (Ind. Ct.App.2001). This is because courts will assume that "the legislature does not intend by a statute to make any change in

the common law beyond what it declares either in express terms or by unmistakable implication." *Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.,* 578 N.E.2d 669, 673 (Ind.1991).

At common law, the tort of seduction was based on the concept that a person entitled to a woman's services could bring suit for the loss of those services. 70 Am.Jur.2d *Seduction* § 50 (1987). Since the theory of seduction was that services were lost by one who was entitled to them, the woman herself could not bring a seduction suit at common law. *Id.* Usually, the elements required to prove a case of seduction included "(1) enticement, persuasion, or solicitation of some nature, or a promise of marriage; (2) chastity of the female at the time of the alleged seduction; and (3) sexual intercourse as a result of the enticement." *Id.* § 52. Thus, contrary to the Center's position, a cause of action for seduction did exist at common law.

Our supreme court expanded the remedy for the tort of seduction in 1846, when it held that a suit for seduction would lie even if the plaintiff's daughter was not in his service and did not intend to return to his home. *Boyd v. Byrd,* 8 Blackf. 113, 114, 1846 WL 2671 (Ind.1846). Thus, it seems that damages other than for loss of services, such as for humiliation, were permitted. In 1852, our General Assembly passed a statute allowing an unmarried woman to sue for her own seduction. 2 Gavin & Hord's Revised Statutes of the State of Indiana § 25, at 55 (1862).

Not until 1935 was the cause of action for seduction limited. In that year, the General Assembly, as part of a collection of "anti-heart balm" statutes, abolished the tort of seduction if the woman seduced was *twenty-one years of age or older.* Baldwin's Ind. Stat. § 2–508 (Banks–Baldwin 1935). In 1973, our General Assembly

abolished the tort of seduction if the woman seduced was *eighteen years of age or older.* Ind.Code § 34–4–4–1 (recodified at Ind.Code § 34–12–2–1). Indiana's modern "anti-heart balm" statute only prohibits suits for "seduction of any female person of at least eighteen (18) years of age." I.C. § 34–12–2–1(a)(4).

Because the current version of Indiana Code section 34–12–2–1(a)(4) only alters the common law by barring actions by women *who have attained the age of eighteen,* we conclude that women who have not attained that age and their parents are not prohibited from bringing suits against a tortfeasor for the common law tort of seduction.

### III.   Respondeat Superior

■   The Kavanaughs argue that the trial court erred in finding that the Center is not vicariously responsible for Lehman's tort. Specifically, the Kavanaughs argue that the Center owed a non-delegable duty to L.N.K. and is thus responsible for Lehman's actions.

■   Under the vicarious liability theory of respondeat superior, "an employer is liable for the acts of its employees which were committed within the course and scope of their employment." *City of Fort Wayne v. Moore,* 706 N.E.2d 604, 607 (Ind. Ct.App.1999). If the act complained of is the employee's idea and is done "with no intention to perform it as part of or incident to the service for which he is employed," then the employer is generally not responsible. *Gomez v. Adams,* 462 N.E.2d 212, 223 (Ind.Ct.App.1984). However, our supreme court has held that in certain cases, the employer may nevertheless be held responsible for an employee's acts because a "non-delegable duty akin to that imposed on common carriers" may exist. *Stropes v. Heritage House Childrens Ctr.,* 547 N.E.2d 244, 250 (Ind.1989).

In *Stropes,* the victim was a patient with cerebral palsy and severe mental retardation. He had been placed in Heritage House Children's Center, a facility providing round-the-clock care and supervision. Robert Griffin, a nurse's aide, was responsible for feeding, bathing, and changing bedding for Stropes. Griffin molested Stropes and pleaded guilty to two sexual offenses. Stropes sued Heritage House, arguing that Heritage House was vicariously liable for Griffin's actions. Our supreme court held, in reversing both the trial court and this court, that Heritage House owed a non-delegable duty to Stropes akin to the heightened duty owed by a common carrier: "Liability is predicated on the passenger's surrender and the carrier's assumption of the responsibility for the passenger's safety, the ability to control his environment, and his personal autonomy in terms of protecting himself from harm." *Id.* at 253. In ordering the case to proceed to trial, our supreme court stated that "given the degree of [Strope]'s lack of autonomy and his dependence on Heritage for care and the degree of Heritage's control over [Stropes] and the circumstances in which he found himself, we find that Heritage assumed a non-delegable duty to provide protection and care so as to fall within the common carrier exception." *Id.* at 254.

In a more recent decision, this court found that the Vigo County Sheriff may be held liable for the sexual acts of a jailer perpetrated upon a female inmate. *Robins v. Harris,* 740 N.E.2d 914, 918 (Ind.Ct. App.2000), *adopted in relevant part by* 769 N.E.2d 586, 587 (Ind.2002). The jailer forced the victim to perform fellatio on him while the victim was an inmate. We found that liability could attach to the sheriff because "the sheriff and his employees maintain extraordinary control over the minutest details of their prisoners' lives." *Id.* at 918. We noted that the jailer con-

ducts inspections, supervises feeding, and "controls all inmate movement within security areas." *Id.* Thus, the sheriff owed the abused inmate the heightened duty of a common carrier.

Here, the Center did not have the degree of control over L.N.K. that is required for the heightened duty of a common carrier to apply at the time the tort of seduction was completed. No acts of sexual intercourse occurred until L.N.K. was an outpatient, though undoubtedly enticement or persuasion may have been occurring while she was an inpatient. Appellees' App. p. 41. Both in *Stropes* and *Robins,* the torts complained of began and ended while the plaintiffs were completely dependent on the defendant's employees. Once L.N.K. became a Center outpatient, the rationale underlying *Stropes* and *Robins*—lack of autonomy and dependence upon the defendant—disappeared. Once she was an outpatient, L.N.K. was no longer under the Center's control.

## CONCLUSION

In light of our disposition of the issues set forth above, we conclude that the trial court erroneously held that seduction is not an actionable tort. However, the trial court did not err in finding that the Center was not vicariously liable for Lehman's actions. Consequently, the trial court correctly granted the Center's motion for summary judgment.

Judgment affirmed.

RILEY, J., and MATHIAS, J., concur.